# Illinois Official Reports

## Supreme Court

---

### *People v. LeFlore*, 2015 IL 116799

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. KEITH LeFLORE, Appellee. |
| Docket No. | 116799 |
| Filed | May 21, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Kane County, the Hon. Allen M. Anderson, Judge, presiding. |
| Judgment | Appellate court affirmed in part and reversed in part. Circuit court affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Joseph H. McMahon, State's Attorney, of St. Charles (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Eldad Z. Malamuth, Assistant Attorneys General, of Chicago, and Patrick Delfino, Lawrence M. Bauer and Jay Paul Hoffmann, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Darren E. Miller, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, and Christopher D. Moore, law student, for appellant. |

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Kilbride and Karmeier concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justices Freeman and Theis.

## OPINION

¶ 1        Defendant, Keith LeFlore, was charged with aggravated robbery, robbery and burglary in connection with an April 24, 2009, robbery of a gas station in Aurora, Illinois. Defendant filed a pretrial motion to quash arrest and suppress evidence, arguing that police improperly used a Global Positioning System (GPS) device without a warrant to track the movements of a vehicle he used. The trial court denied the motion. Following a jury trial, defendant was convicted of all charges, and sentenced to 20 years in prison on the aggravated robbery charge. The appellate court reversed and remanded. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 2                                  BACKGROUND

¶ 3        In April 2009, Aurora police received a tip from the Crime Stoppers hotline that defendant was committing burglaries on the west side of Aurora and bringing "various items" into his apartment complex. The police located defendant's address at the apartment complex after a data search. Police also discovered that defendant was on mandatory supervised release from prison. They also knew that in a recent police encounter defendant had been arrested for fleeing in a red Kia Spectra with license plate X743***. The Kia was registered to Stephanie Powell, who lived at the same address as defendant.

¶ 4        On April 23, 2009, Aurora police detective Jeremy Shufelt placed a GPS device under the rear bumper of the Kia while it was parked at the apartment complex where defendant resided. Detective Shufelt did not obtain a warrant to place the GPS device on the car's exterior. Early the next morning, a local gas station located a few minutes from defendant's residence was held up. Tracking from the GPS device showed that the Kia was parked near the gas station at the time it was robbed around 4:40 a.m.

¶ 5        A surveillance camera captured the robbery on video. It showed that the robber used what looked like a shotgun. He took the cash drawer and a carton of Newport cigarettes from the cashier and fled. The video also showed that the robber was wearing a pair of Steve Madden athletic shoes, which have a distinctive striping pattern on them.

¶ 6        On the evening of the same day as the robbery, police conducted a parole search of defendant's residence. Defendant arrived at the apartment complex driving the Kia at the same time the police were conducting their search of his residence. Defendant was taken into custody for driving with a revoked license. He was wearing Steve Madden athletic shoes. During the search, the police recovered a hollow metal cane that had the rubber tip removed from the end.

¶ 7        When defendant was interviewed, the police told him that he had been under surveillance, but they did not tell him about the use of the GPS device. The police also told him that the apartment complex's video camera showed him leaving early in the morning. After the police placed the metal cane in the interview room, defendant confessed, explaining that he made the cane look like a gun by removing the rubber stopper at the end and placing a black grocery-type bag around the center. The cashier from the store later picked defendant out of a photo lineup.

¶ 8        Defendant was eventually charged with aggravated robbery, robbery and burglary in the circuit court of Kane County. Defendant filed a motion to quash his arrest and suppress evidence, arguing that it was solely through information received through the GPS tracking device that defendant became a suspect in the robbery and therefore all the evidence against him should be suppressed. The trial court denied the motion, finding that the use and "the existence" of the GPS device, which did not interfere with defendant's possessory interest in the vehicle, did not constitute a search under either the federal or state constitutions. Relying upon *United States v. Knotts*, 460 U.S. 276 (1983), *United States v. Karo*, 468 U.S. 705 (1984), and *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), as controlling authority, the court concluded that the fourth amendment was not violated because "the information secured by the police was equal to what personal surveillance would have revealed and [was] available from the observations that could have been made on or about the public way or the publicly accessible locations."

¶ 9        Defendant represented himself at his trial and the jury found him guilty of all charges. The trial court entered judgment on the aggravated battery charge and sentenced defendant to 20 years in prison. On appeal, defendant argued that the trial court erred in denying his motion to quash arrest and suppress evidence, and that the court erroneously allowed him to waive counsel without properly admonishing him under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984).

¶ 10        While this case was pending on appeal in the appellate court, the United States Supreme Court decided *United States v. Jones*, 565 U.S. ___, ___, 132 S. Ct. 945, 948-49 (2012), which held that the attachment of a GPS tracking device and the subsequent use of the device to monitor a vehicle's movements on public streets was a search under the fourth amendment because the placement of the device constituted an unlawful trespass. Also while this case was pending on appeal, the Supreme Court decided *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419 (2011). In *Davis*, the Court applied the good-faith exception to the exclusionary rule to an automobile search conducted by a state police officer "in objectively reasonable reliance on binding judicial precedent." *Id.* at ___, 131 S. Ct. at 2428-29.

¶ 11        Prior to the oral argument before the appellate court in the present case, the State submitted *Jones* as additional authority. 2013 IL App (2d) 100659, ¶ 83 (Birkett, J., concurring in part and dissenting in part). The parties were then directed to address *Davis* and whether the good-faith exception applied. *Id*. At oral argument, the State argued that *Knotts* and *Karo* were "binding precedent" at the time the search was conducted, and defendant argued that those two cases were distinguishable because they involved "beeper" tracking devices and not the more advanced GPS technology used here. *Id.* ¶ 108.

¶ 12        A divided appellate court reversed defendant's conviction based on *Jones* and remanded for further proceedings to determine whether defendant borrowed the vehicle with Powell's

consent so as to establish standing under *Jones*. *Id*. ¶ 29 (majority opinion). The appellate court majority accepted defendant's argument that the good-faith exception to the exclusionary rule was not applicable due to the more advanced nature of GPS tracking. *Id*. ¶¶ 44-45. However, Justice Birkett in his partial dissent determined, among other things, that the good-faith exception applied and that the evidence that resulted from the GPS tracking should not be excluded. He concluded that the trial court correctly ruled that *Knotts* and *Karo* were "binding precedent" that controlled the outcome at the time the search was conducted in April 2009. *Id*. ¶ 115 (Birkett, J., concurring in part and dissenting in part). Finally, the appellate court was in unanimous agreement that the defendant's convictions must be reversed and the cause remanded for a new trial based on the trial court's failure to properly admonish defendant pursuant to Supreme Court Rule 401(a) (Ill. S. Ct. R. 401(a) (eff. July 1, 1984)). 2013 IL App (2d) 100659, ¶ 60.

¶ 13    We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013). Before this court, the State concedes that the appellate court correctly determined that defendant must be retried based on the lack of proper admonishments under Supreme Court Rule 401(a). The State contends, however, that upon remand for a new trial, there is no need for the trial court to hold a new suppression hearing. In that regard, three issues are raised before this court: (1) whether the fourth amendment permitted police to place a GPS device on a car associated with defendant, where defendant was on mandatory supervised release from prison at the time and thus had a diminished expectation of privacy from that of an ordinary citizen; (2) whether defendant is entitled to a remand to present new evidence to establish his interest in the Kia so that he can avail himself of the holding in *Jones*; and (3) whether the good-faith exception to the exclusionary rule is applicable under the circumstances of this case so that the evidence compiled against defendant as a result of the installation and use of the GPS device should not be excluded. For the reasons that follow, we find that the good-faith exception to the exclusionary rule is applicable and that a new suppression hearing is therefore not warranted. Because this issue is dispositive, we find it unnecessary to address the two other issues raised by the parties.

¶ 14                                                    ANALYSIS

¶ 15    The fourth amendment to the United States Constitution provides that:

> "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

¶ 16    In a similar fashion, the Illinois Constitution provides that:

> "[t]he people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

This court interprets the search and seizure clause of the Illinois Constitution in "limited lockstep" with its federal counterpart. *People v. Caballes*, 221 Ill. 2d 282, 314 (2006).

¶ 17    Searches conducted without a warrant are *per se* unreasonable under the fourth amendment subject only to a few exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court created the exclusionary rule as a general deterrent to future fourth amendment violations. *Arizona v. Evans*, 514 U.S. 1, 10 (1995). Despite the exclusionary rule's relationship to the fourth amendment, however, there is no constitutional right to have the fruits of an illegal search or seizure suppressed at trial. *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (*en banc*) (noting that the fourth amendment " 'says nothing about suppressing evidence in violation of [its] command' " (citing *Davis*, 564 U.S. at ___, 131 S. Ct. at 2426)). The judicially created doctrine of exclusion at times suppresses the evidence and makes it unavailable for trial. However, even when a fourth amendment violation has occurred, the evidence that resulted will not be suppressed when the good-faith exception to the exclusionary rule applies. *Katzin*, 769 F.3d at 169-70.

¶ 18    In the present case, we need not determine whether Aurora police conducted an unreasonable search in violation of *Jones*. Nor do we need to remand for further proceedings to determine whether defendant had a sufficient possessory interest in the Kia to avail himself of the holding in *Jones*. This is because even assuming that the search violated the fourth amendment, the good-faith exception is applicable and suppression is not warranted.

¶ 19    Defendant seeks to avoid that result by arguing that Aurora police do not fall under the good-faith exception as explained in *Davis* because *Knotts* and *Karo* are distinguishable cases that the officers could not have reasonably relied upon. Defendant argues that both cases are distinguishable because they involved beeper tracking and not GPS technology and did not involve a trespass of the device onto the vehicle's exterior without the consent of the owner. Defendant also argues that police could not have reasonably relied upon *Garcia*, a Seventh Circuit Court of Appeals case directly on point, because that case "is not binding precedent on Illinois courts." In defendant's view, binding precedent only exists if it is from the same jurisdiction in which the case is prosecuted, is followed by police to the "letter," and is on all fours with the case to be decided.

¶ 20    As we will explain more fully below, defendant's reading of *Davis* is incorrect and too narrow. Acceptance of the narrow interpretation of *Davis* proposed by defendant would mean neglecting or ignoring the important principles that have been set forth by the Supreme Court to help determine whether the good-faith exception to the exclusionary rule should apply in any given case. We also note at the outset that all of the federal circuits that have considered post-*Jones* whether the good-faith exception applies in cases of warrantless GPS searches conducted pre-*Jones* have rejected a narrow reading of *Davis* and have instead concluded that the good-faith exception applies under circumstances identical to the present case. *E.g.*, *United States v. Katzin*, 769 F.3d 163 (3d Cir. 2014) (*en banc*) (although the facts of *Knotts* and *Karo* differ from *Jones*, it is the rationale that underpins those decisions that is considered binding appellate precedent and that it was objectively reasonable for the officers to rely upon the precedent under *Davis*); *United States v. Stephens*, 764 F.3d 327, 338 (4th Cir. 2014) ("[w]ithout the benefit of hindsight *** and with no contrary guidance from the Supreme Court or this Court, *** a reasonably well-trained officer in this Circuit could have relied on *Knotts* as permitting the type of warrantless GPS usage in this case"); *United States v. Brown*, 744 F.3d 474, 478 (7th Cir. 2014) (rehearing and rehearing *en banc* denied) (observing that "all of the extant appellate precedent is on the side of applying *Davis*" and its good-faith exception to "*all* pre-*Jones* GPS tracking," even when installation was nonconsensual and without a

warrant (emphasis in original)); *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) (found that at the time police placed the GPS tracking device on the defendant's car in 2009, law enforcement could reasonably rely upon the binding appellate precedent of *Knotts* and *Karo*); *United States v. Sparks*, 711 F.3d 58, 65 (1st Cir. 2013) (noting that even though the circuit had not addressed warrantless GPS tracking prior to *Jones*, the Supreme Court's decision in *Knotts* was "sufficiently clear and apposite" to trigger *Davis*'s good-faith exception); see also *Kelly v. State*, 82 A.2d 205, 214 (Md. 2013) (the state's highest court determined that *Knotts* was sufficient binding appellate precedent in Maryland to authorize GPS tracking at the time officers installed the device to the defendant's vehicle pre-*Jones*).

¶ 21                    I. *Exclusionary Rule and the Good-Faith Exception*

¶ 22        We turn now to the guiding principles that should govern any analysis as to the applicability of the exclusionary rule or its good-faith exception. There is no constitutional right to have the evidence resulting from an illegal search or seizure suppressed at trial. *Katzin*, 769 F.3d at 170 (quoting *Davis*, 564 U.S. at ___, 131 S. Ct. at 2426). The mere fact of a fourth amendment violation does not mean that exclusion necessarily follows. *Id*. Instead, application of the exclusionary rule has been restricted to those "unusual cases" where it can achieve its sole objective: to deter future fourth amendment violations. *Id.* (citing *United States v. Leon*, 468 U.S. 897, 909 (1984)). The Supreme Court has repeatedly expressed the notion that "exclusion 'has always been our last resort, not our first impulse.' " *Herring v. United States*, 555 U.S. 135, 140 (2009).

¶ 23        In order for exclusion of the evidence to apply, the deterrent benefit of suppression must outweigh the "substantial social costs." *Leon*, 468 U.S. at 907. " 'Exclusion exacts a heavy toll on both the judicial system and society at large,' because it 'almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence,' and 'its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.' " *Stephens*, 764 F.3d at 335 (quoting *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427). "As this result conflicts with the 'truth-finding functions of judge and jury,' *United States v. Payner*, 447 U.S. 727, 734 *** (1980), exclusion is a 'bitter pill,' *Davis*, 131 S. Ct. at 2427, swallowed only as a 'last resort,' *Hudson*, 547 U.S. at 591, 126 S. Ct. 2159." *Katzin*, 769 F.3d at 171. In order for the exclusionary rule to be appropriate then, the deterrent benefits must outweigh its heavy costs. *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427.

¶ 24        Where the particular circumstances of a case show that police acted with an " 'objectively "reasonable good-faith belief" that their conduct [was] lawful,' " or when their conduct involved only simple, isolated negligence, there is no illicit conduct to deter. *Katzin*, 769 F.3d at 171 (quoting *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427-28, quoting *Leon*, 468 U.S. at 909). In such a case, " 'the deterrence rationale loses much of its force and exclusion cannot pay its way.' " (Internal quotation marks omitted.) *Id.* (quoting *Davis*, 564 U.S. at ___, 131 S. Ct. at 2428, quoting *Leon*, 468 U.S. at 907 n.6, 919). Thus, exclusion is invoked only where police conduct is both "sufficiently deliberate" that deterrence is effective and "sufficiently culpable" that deterrence outweighs the cost of suppression. *Herring*, 555 U.S. at 144; *Katzin*, 769 F.3d at 171.

¶ 25        The "pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers." (Internal quotation marks omitted.) *Herring*, 555

U.S. at 145. Thus, in determining whether the good-faith exception applies, a court must ask "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." (Internal quotation marks omitted.) *Id.* (quoting *Leon*, 468 U.S. at 922 n.23).

¶ 26                    II. *Davis's Application to the Specific Circumstances Before It*

¶ 27        In *Davis*, the Supreme Court applied the good-faith exception in one specific instance: to an automobile search following an arrest conducted by a local Greenville, Alabama, city police officer investigating a state DUI offense. The question for the Court was whether the officer could have reasonably relied upon an Eleventh Circuit Court of Appeals precedent as authority for his conduct in deciding to search the vehicle. In that case, police found in the course of their search a handgun in defendant's jacket left inside the vehicle, and defendant was subsequently prosecuted for a firearm charge in federal court. *Davis* held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2423-24. The Court explained that "[a]n officer who conducts a search in reasonable reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances. [Citation.] The deterrent effect of exclusion in such a case can only be to discourage the officer from do[ing] his duty." (Internal quotation marks omitted.) *Id.* at ___, 131 S. Ct. at 2429. Of paramount importance to the Court's holding was the lack of police culpability:

> "Under our exclusionary-rule precedents, [the] acknowledged absence of police culpability dooms Davis's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' [Citation.] The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis's *** rights deliberately, recklessly, or with gross negligence. [Citation.] Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement. [Citation.] The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case. Indeed, in 27 years of practice under *Leon*'s good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Id*. at ___, 131 S. Ct. at 2428-29.

¶ 28

¶ 29        Thus, if it can be said in the present case that "binding appellate precedent" existed on April 23, 2009, allowing for warrantless GPS use when Detective Shufelt installed the device, then *Davis* controls without a doubt and the exclusionary rule does not apply. However, even if it could be concluded that "binding appellate precedent" did not exist in this case, it would not end the inquiry. It would still be necessary to conduct the "good-faith inquiry" and consider "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." (Internal quotation marks omitted.) *Herring*, 555 U.S. at 145. Clearly, application of the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court in *Davis* or any other Supreme Court case. *Stephens*, 764 F.3d at 336. The Supreme Court has found the exclusionary rule to be inapplicable in a variety of

settings after undertaking the good-faith analysis, and the fact that a court might apply the good-faith exception in a new context not yet addressed by the Supreme Court does not mean that it is creating a "new, freestanding exception" to the exclusionary rule. *Id.* at 336 n.10; see also *Davis*, 564 U.S. at ___, 131 S. Ct. at 2428 (noting that "[t]he Court has over time applied this 'good-faith' exception across a range of cases").

¶ 30                    III. *Exclusionary Rule Does Not Apply for Three Reasons*

¶ 31    We find that application of the exclusionary rule to this case is not appropriate for three reasons. First, the exclusionary rule does not apply because at the time of Detective Shufelt's conduct in April 2009, the United States Supreme Court's decisions in *Knotts* and *Karo* were "binding appellate precedent" that he could have reasonably relied upon. Second, we find in the alternative that, pursuant to the Supreme Court's general good-faith analysis, the police conduct in relying on the legal landscape that existed at the time was objectively reasonable and a reasonable officer had no reason to suspect that his conduct was wrongful under the circumstances. And third, this case fits squarely within the specific holding of *Davis*, because *United States v. Garcia*, 474 F.3d 994, 996-97 (7th Cir. 2007), was binding precedent as far as the Aurora police detective was concerned and he stood in exactly the same shoes as the Alabama police officer in *Davis* that relied upon binding Eleventh Circuit Court of Appeals precedent when he conducted a search in the course of investigating a state law traffic offense. Accordingly, suppression of the evidence is not warranted for each of these reasons.

¶ 32                    IV. *Knotts and Karo Were Binding Appellate Precedent*

¶ 33    There is no question that decisions of the United States Supreme Court interpreting fourth amendment law are binding precedent for Illinois police officers and Illinois courts. We conclude that the Supreme Court cases of *Knotts* and *Karo* clearly authorized the police conduct in this case. Even though the underlying facts of those cases differ from the facts of the present case, it is the rationale that underlies those cases that is relevant to our discussion. See *Katzin*, 769 F.3d at 173-74; *Stephens*, 764 F.3d at 337-38.

¶ 34    In *Knotts*, the police were investigating suspects relative to a conspiracy to manufacture illegal drugs. *Knotts*, 460 U.S. at 278. The police arranged for one of the suspects to voluntarily take into his vehicle a container of chloroform that, unbeknownst to the suspect, contained a beeper. By tracking the signals emitted from the beeper, police were able to locate it at defendant's secluded manufacturing site. The defendant sought to suppress the evidence that was obtained as a result of the warrantless monitoring of the beeper. The Supreme Court held that the use of the beeper to track a vehicle was not a search under the fourth amendment. *Id.* at 285. The Court explained that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," and the beeper simply revealed what could have been seen by the public through visual surveillance and it made no difference that the officers' "sensory faculties" were augmented by its use. *Id.* at 281, 282.

¶ 35    In *Karo*, the defendant ordered 50 gallons of ether (for use in cocaine smuggling) from an informant. *Karo*, 468 U.S. at 708. After obtaining the informant's consent, federal agents substituted one of the informant's cans of ether with its own can, which contained a beeper. Defendant bought the can and took it into his car. For the next several months, the agents

monitored the beeper to determine the location of the ether. One of the questions presented before the Supreme Court was whether the warrantless *installation* of the beeper was legal. *Id*. at 711.

¶ 36 The Court in *Karo* concluded that the warrantless *installation* of the beeper did not violate the fourth amendment. *Id*. at 713. The Court found that the transfer of the can with the beeper did not convey any information, and although there was a potential that the defendant's privacy could be invaded, the transfer itself infringed no privacy interest. *Id.* at 712. Moreover, the Court found that the transfer was not a seizure despite the "technical trespass on the space occupied by the beeper," which the Court referred to as "unknown and unwanted foreign object." *Id.* The Court then proceeded to "broadly discredit[ ] the relevance of trespass in the context of electronic surveillance of vehicles: '[A] physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, ... for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.' " *Katzin*, 769 F.3d at 175 (quoting *Karo*, 468 U.S. at 712-13); see also *Aguiar*, 737 F.3d at 261 (also noting that *Karo* discounted the importance of trespass in placing a tracking device).

¶ 37 As the Court of Appeals, Second Circuit, explained in *Aguiar*:

> "*Karo's de minimis* treatment of the trespass issue gave no indication that the issue of trespass would become the touchstone for the analysis in *Jones*. Moreover, *Karo's* brushing off of the potential trespass fits logically with earlier Supreme Court decisions concluding that 'the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein.' " *Aguiar*, 737 F.3d at 261 (quoting *New York v. Class*, 475 U.S. 106, 112 (1986) (to examine the exterior of an automobile does not constitute a search)).

See also *Cardwell v. Lewis*, 417 U.S. 583, 591 (1974) (plurality opinion) (warrantless taking of paint scrapings from the exterior of a vehicle does not constitute an unlawful search).[1]

¶ 38 We conclude that it was objectively reasonable for the police to rely upon *Knotts* and *Karo* for the conclusion that warrantless installation and monitoring of the GPS device was legal. We acknowledge that the facts are different here, but again it was reasonable for Detective Shufelt to rely upon the legal principles set forth by the Supreme Court. Here, police monitored the movement of the Kia by GPS not by a beeper signal. But there is no legally significant difference between the two technologies, and in both cases the devices were "unknown and unwanted objects." Moreover, the police surreptitiously affixed a GPS device to the underside of the Kia's bumper rather than surreptitiously "tricking him into unwittingly taking the GPS device into his vehicle," but otherwise the conduct of law enforcement here "echoed that in *Knotts* and *Karo*." *Katzin*, 769 F.3d at 176. Just like in *Karo*, the attachment of the GPS device did not itself convey any information or infringe any privacy interest apart from its use.

¶ 39 We fully agree with the conclusion reached by the United States Court of Appeals, Third Circuit, in its *en banc* decision in *Katzin* in considering the same issue under the identical facts

---

[1]It must be recognized that there would have been no merit to any argument raised before *Jones* that a physical trespass to private property, standing alone, would constitute a search. See, *e.g.*, *Florida v. Riley*, 488 U.S. 445, 459 n.3 (1989) (noting that *Katz v. United States*, 389 U.S. 347, 351 (1967), "made plain that the question whether or not the disputed evidence had been procured by means of a trespass was irrelevant").

presented here: "It would have been objectively reasonable for a law enforcement officer to conclude that *Karo's* sweeping rejection of the trespass theory applied not only to the [federal] agents' elaborate ruse therein, but also to the unremarkable strategy of magnetically attaching a battery-operated GPS unit onto the exterior of a vehicle. In sum *** the Supreme Court's rationale was broad enough to embrace the agents' conduct, and their reliance on this binding appellate precedent was objectively reasonable under *Davis*." *Katzin*, 769 F.3d at 175.

¶ 40                          V. *Conclusion That Knotts and Karo Are Binding Precedent*
                                *for Pre-Jones GPS Searches Is Supported by All of the*
                                *Federal Court of Appeals Decisions to Address the Issue*

¶ 41            In the aftermath of *Jones*, all of the federal circuit court of appeals decisions to directly consider whether *Knotts* and/or *Karo* are binding appellate precedent under *Davis*—so that evidence obtained through warrantless GPS installation and use pre-*Jones* should not be excluded—have answered the question in the affirmative and have applied the good-faith exception. See *United States v. Katzin*, 769 F.3d 163, 173-75 (3d Cir. 2014); *United States v. Stephens*, 764 F.3d 327, 338 (4th Cir. 2014); *United States v. Aguiar*, 737 F.3d 251, 261-62 (2d Cir. 2013); see also *United States v. Brown*, 744 F.3d 474, 478 (7th Cir. 2014) (finding *Knotts* and *Karo* are binding appellate precedent for purposes of consensual GPS installation and subsequent monitoring; and stating that "all of the extant appellate precedent is on the side of applying *Davis*['s]" good-faith exception to all nonconsensual searches conducted pre-*Jones* as well, and doubting the deterrent benefit of prohibiting police from relying on out-of-circuit authority just because a particular circuit lacks its own authority); *United States v. Sparks*, 711 F.3d 58, 65, 67 (1st Cir. 2013).[2] Thus, the First, Second, Third and Fourth Circuits all clearly hold that *Knotts* and/or *Karo* are binding appellate precedent for purposes of *Davis*. Additionally, many of the other circuits will likely not have much opportunity to address this precise point because they already had decided cases before *Jones* was decided, holding that warrantless attachment and use of a GPS device on a suspect's vehicle was acceptable under *Knotts* and/or *Karo*. Consequently, there would be no need to consider *Knotts* and *Karo* specifically as supporting application of the good-faith exception where their own circuit precedent had already existed. See, *e.g.*, *United States v. Hernandez*, 647 F.3d 216, 220-21 (5th Cir. 2011) (relying on *Knotts* and its own prior precedent on beepers to hold that warrantless GPS attachment and monitoring was not a search in a case decided before *Jones*); *United States v. Garcia*, 474 F.3d 994, 996-97 (7th Cir. 2007) (same holding that warrantless GPS installation and use was not a search); *United States v. Marquez*, 605 F.3d 604, 610 (8th Cir. 2010) (GPS installation and use requires only reasonable suspicion, not a warrant); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1215-17 (9th Cir. 2010) (GPS installation and use is not a search); *United States v. McIver*, 186 F.3d 1119, 1126-27 (9th Cir. 1999) (holding that GPS installation was not a search); *United States v. Smith*, 387 F. App'x 918, 921 (11th Cir. 2010) (*per curiam*) (installation of a GPS device did not violate the fourth amendment because the defendant had no reasonable expectation of privacy in the exterior of his vehicle). There is,

_____

[2]*Sparks* also relied upon its own pre-*Jones* precedent in *United States v. Moore*, 562 F.2d 106 (1st Cir. 1977), a case decided years before *Knotts*. *Sparks* did not delineate where its reliance on *Knotts* ended and its reliance on *Moore* began, but *Sparks* relied upon *Knotts* as binding appellate precedent for the same reasons we do. See *Sparks*, 711 F.3d at 65-67.

- 10 -

then, nearly a clean sweep across the federal circuits holding that *Knotts* and *Karo* are controlling precedent for GPS searches pre-*Jones*, and there is not any definitive authority to the contrary. *Cf. United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010) (holding only that prolonged use of a GPS device, for 28 days, violated the fourth amendment, a question it considered specifically reserved by *Knotts*).

¶ 42        The first of several such cases to squarely address, after *Jones* and *Davis*, the issue of whether *Knotts* and *Karo* can be considered binding precedent for GPS searches conducted before *Jones* was the Second Circuit's decision in *United States v. Aguiar*, which we have already quoted above. It will suffice to note that *Aguiar* unequivocally held that *Knotts* and *Karo* were binding precedent at the time police installed the GPS device on January 23, 2009, and then used it for the next 11 days. *Aguiar*, 737 F.3d at 261. *Aguiar* concluded that those cases were sufficient precedent for police to reasonably conclude that a warrant was not necessary. *Id*. In reaching this conclusion, the court noted that all of the circuits to consider warrantless GPS installation pre-*Jones* had concluded the same, and that no unsettling authority existed among the circuits until at least August 2010 when the District of Columbia Circuit in *Maynard*, 615 F.3d at 565, found only that *prolonged use* of GPS tracking for 28 days, 24 hours a day, violated the fourth amendment.[3] *Aguiar* further noted its conclusion that the officers relied in good faith on *Knotts* in placing the GPS device on the defendant's vehicle was reinforced by the fact that many of its sister circuits had reached similar results. *Aguiar*, 737 F.3d at 262. The court further noted that "[t]hese [out-of-circuit] cases are not binding precedent and thus do not control our analysis ***, but do support the conclusion that relying on *Knotts* was objectively reasonable." *Id*.[4]

¶ 43        The next United States Court of Appeals decision to address whether *Knotts* and *Karo* are binding precedent for GPS searches pre-*Jones* was rendered by the Fourth Circuit in *United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014). In *Stephens*, federal and state law enforcement officers in the Baltimore area were investigating the defendant, a convicted felon, for possible drug and firearm charges. On May 13, 2011, a Baltimore police officer, acting without a warrant, placed a GPS device under the rear bumper of the defendant's vehicle. Three days later, Baltimore city police tracked defendant in the vehicle. When the defendant arrived at his destination, the officers searched the vehicle and found a loaded handgun. The defendant was charged with state law crimes and remained in state custody for about three months, until a federal grand jury indicted the defendant on a federal firearm charge. The State

---

[3]This was the case taken up by the Supreme Court, now captioned *United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945 (2012), which brought forth a "tectonic shift" in the legal landscape, to hold that the *installation* and use of the GPS device was an illegal search because of the trespass to the vehicle's exterior. In *Maynard*, the defendant apparently thought any question as to a possible trespass due to the attachment of the GPS was so well settled that he did not raise it. Moreover, *Maynard* rested its holding on the prolonged surveillance (28 days duration), a question it considered left open by *Knotts*. *Maynard*, 615 F.3d at 558.

[4]*Aguiar* stated that in the aftermath of *Jones*, there was a split in the circuits, as *United States v. Katzin*, 732 F.3d 187, 210 (3d Cir. 2013), "adopted a much stricter rule" declining to apply the good-faith exception because *Knotts* and *Karo* were distinguishable based on the lack of physical intrusion in those cases. *Aguiar*, 737 F.3d at 260. However, the Third Circuit granted rehearing *en banc* in *Katzin*, vacated its previous decision, and instead held that *Knotts* and *Karo* were indeed binding appellate precedent under *Davis*.

- 11 -

of Maryland dismissed the charges after the federal indictment. *Id*. at 330. The cause then proceeded in federal court. Defendant then filed a motion to suppress based on *Jones*, which was denied by the district court. *Id*.

¶ 44 The Fourth Circuit in *Stephens* affirmed the denial of the suppression motion. *Id*. at 339. In so doing, it began by rejecting the defendant's narrow view of the good-faith inquiry. *Id*. at 337. It noted that "*Davis* merely establishes the inapplicability of the exclusionary rule in one specific circumstance. *Davis* does not, however, alter the general good-faith inquiry which, we reiterate, requires consideration of whether a reasonably well-trained officer would have known that a search was illegal in light of all of the circumstances." *Id*. The court then stated that in May 2011, when the search was conducted, which was before *Jones*, neither the Supreme Court nor the Fourth Circuit had expressly approved or disapproved of warrantless GPS usage. *Id*. It then noted that *Knotts* was "not exactly on point." *Id*. But that it was " 'widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements' [citation], and it was the 'foundational Supreme Court precedent for GPS-related cases' [citation]." *Id*. at 338. The court continued: "After *Jones*, we know that such an interpretation of *Knotts* is incorrect. Without the benefit of hindsight, however, and with no contrary guidance from the Supreme Court or this Court, we believe that a reasonably well-trained officer in this Circuit could have relied upon *Knotts* as permitting the type of warrantless GPS usage in this case." *Id*.

¶ 45 The *Stephens* court found its conclusion to be undergirded by Maryland state law precedent (see *Kelly*, 82 A.3d at 216) holding that *Knotts* was binding appellate court precedent in Maryland under *Davis*, and therefore, "Maryland police officers could 'reasonably rely on *Knotts*, pre-*Jones*, in affixing a GPS tracking device to the vehicle of a person under their investigation for the purpose of conducting surveillance.' " *Stephens*, 764 F.3d at 338. The court noted that the fact that defendant was later charged federally did not alter its determination. *Id*. The court then rejected the defendant's argument that Maryland state law was irrelevant because the investigation was federal. *Id*. at 338 n.13. The court further noted that it was a joint state and federal investigation. *Id*. Moreover, the court observed that " 'in the initial stages of a criminal investigation, it may be anything but clear whether the conduct being investigated violates state law, federal law, or both,' [citation] and 'the decision with respect to the court in which charges are to be brought is often made by the Office of the United States Attorney and the state prosecutor, not the investigating officer,' [citation]." *Id*.

¶ 46 The most recent federal court of appeals case to hold that *Knotts* and *Karo* are "binding appellate precedent" under *Davis* is *United States v. Katzin*, 769 F.3d 163 (3d Cir. 2014) (decided *en banc* on rehearing), where the court conducted an excellent and exhaustive analysis of the issues. In *Katzin*, local police officers and the FBI were investigating a series of burglaries of pharmacies in the greater Philadelphia area. *Id*. at 167. On December 13, 2010, officers attached a GPS device to the undercarriage of defendant's van while it was parked on a public street. Two days later the van was tracked to a certain pharmacy that was burglarized at the time defendant's van was there. The defendant was eventually pulled over by state police and defendant was found with items consistent with the burglary of the pharmacy. *Id*. at 168

¶ 47     For the same reasons noted above, *Katzin* found *Knotts* and *Karo* to be binding precedent under *Davis* and law enforcement's reliance upon it to be objectively reasonable. Additionally, *Katzin* rejected a narrow reading of *Davis* by noting the following:

> "[I]f binding appellate precedent specifically authorizes the precise conduct under consideration, then it will likely be binding appellate precedent *** under *Davis*. However, this does not make the reverse syllogism true, namely, that if a case is binding appellate precedent under *Davis*, then it must specifically authorize the precise conduct under consideration. *Davis*' holding is broader: '[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.' [Citation.] While reliance is likely reasonable when the precise conduct under consideration has been affirmatively authorized by binding appellate precedent, it may be no less reasonable when the conduct under consideration clearly falls well within rationale espoused in binding appellate precedent, which authorizes nearly identical conduct.
>
> Accordingly, what is far more important to our conclusion is that, despite these few dissimilarities [*i.e.*, clandestinely installing a GPS to the exterior of the van rather than clandestinely tricking him into unwittingly taking the beeper device into his vehicle], the agents' nearly identical conduct fits squarely within the rationale of these decisions." *Id*. at 176.

¶ 48     *Katzin* then found in the alternative that even if the factual dissimilarities somehow disqualified *Knotts* and *Karo* from being binding precedent, which could be reasonably relied upon under *Davis*, the inquiry would not end there. *Katzin* noted that *Davis* was "but one application of the good faith exception," although undoubtedly the most analogous one. *Id*. at 177. *Katzin* further noted that "[e]ven where *Davis* does not control, it is our duty to consider the totality of the circumstances to answer the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal." (Internal quotation marks omitted.) *Id*. It further explained that:

> "*Davis* did not begin, nor end, with binding appellate precedent. Rather, binding appellate precedent informed—and ultimately determined—the Supreme Court's greater inquiry: whether the officers' conduct was deliberate and culpable enough that application of the exclusionary rule would 'yield meaningful[l] deterrence,' and 'be worth the price paid by the justice system.' [Citation.] We must conduct the same analysis on the facts before us, even in the absence of binding appellate precedent." *Id*. at 178.

¶ 49     *Katzin* then reviewed the legal landscape as it existed at the time law enforcement installed the GPS device in December 2010, which included *Knotts* and *Karo* and several out-of-circuit decisions specifically upholding warrantless GPS installation and tracking. The court found that "[g]iven the panoply of authority authorizing their actions, we cannot conclude that a 'reasonably well trained officer would have known that the search was illegal,' [citation] nor that the agents acted with a 'deliberate, reckless, or grossly negligent disregard for [Appellees'] Fourth Amendment rights,' [citation]." *Id*. at 184.

## VI. *Objectively Reasonable Good-Faith Belief*

This brings us to our second reason for holding that the exclusionary rule is inapplicable under the circumstances. We find in the alternative, as the court did in *Katzin*, that, pursuant to the Supreme Court's general good-faith analysis, the detective's conduct, in relying on the legal landscape that existed at the time the search was conducted, was objectively reasonable, and he had no reason to suspect that his conduct was wrongful under the circumstances. Therefore, the exclusionary rule cannot be invoked here. It simply cannot be applied to a situation where it offers little or no deterrent benefit and where there is not the least bit of culpability that can be charged to the officer's conduct in conducting a warrantless GPS search in 2009.

As noted, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful \*\*\*, the deterrence rationale loses much of its force, and exclusion cannot pay its way." (Internal quotation marks omitted.) *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427-28 (quoting *Leon*, 468 U.S. at 907 n.6). We have already discussed the rationale of *Knotts* and *Karo* and how they were widely and reasonably understood to stand for the proposition that the fourth amendment was simply not implicated by electronic surveillance of automotive movements. Moreover, *Karo*'s "brushing off" and "discount[ing]" of the trespass theory meshed logically with earlier Supreme Court decisions concluding that the physical characteristics of an automobile and its use result in a lessened expectation of privacy. Additionally, it must be conceded that there would have been no merit to any argument raised prior to *Jones* that a physical trespass to the private property of a vehicle's exterior would have constituted a search. See *supra* ¶ 37 n.1. When all of this is combined with the fact that there was no contrary federal circuit court or Illinois precedent in existence—but rather all of the federal court of appeals authority was in agreement, including the Seventh Circuit, one of the jurisdictions in which the police officers in this case operated, specifically having concluded that warrantless installation and use of a GPS device did not violate the fourth amendment (*Garcia*, 474 F.3d at 996-98; *McIver*, 186 F.3d at 1126-27)—then the circumstances are overwhelmingly in favor of concluding that suppression is not warranted here.

Given the state of the law with which police officers were faced in 2009, there is no merit to defendant's intimation that the police in this case were risking that their conduct would be held unconstitutional. To characterize the officer's conduct in such a manner is simply not a fair assessment in view of the legal landscape.

There is also no merit to the notion that the good-faith exception may never be applied in a state prosecution where local police reasonably rely upon the legal landscape in existence but there are no state law cases addressing the issue. "Nothing in *Davis* itself supports such an interpretation." *Stephens*, 764 F.3d at 337; see also *Brown*, 744 F.3d at 478 (questioning whether there is any deterrence to be gained by telling police they may not "rely on decisions issued by several circuits, just because the circuit covering the state in which an investigation is ongoing lacks its own precedent"). And none of the Supreme Court precedent cited by the parties supports the idea that police may not rely upon the " 'constitutional norm' " that has been established by the legal landscape. See *Katzin*, 769 F.3d at 184 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975) (where the Court considered the "constitutional norm" established by the court of appeals when determining whether an officer "had knowledge, or [could] properly be charged with knowledge, that the search was unconstitutional under the

Fourth Amendment")).

¶ 55    VII. *Garcia Was Binding Appellate Precedent Under Davis*

¶ 56    The third major point supporting our holding is that for purposes of *Davis*'s good-faith inquiry, the Seventh Circuit Court of Appeals decision in *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), was "binding appellate precedent" for Illinois police officers that they could have reasonably relied upon in 2009. In *Garcia*, the defendant was a convicted felon who had served time for methamphetamine offenses. *Id*. at 995. Shortly after his release from prison, police received a tip from an informant that the defendant was selling meth and wanted to start manufacturing it again. The police located defendant's vehicle and secretly placed a GPS device underneath the rear bumper. Evidence was subsequently gathered as a result of the GPS tracking that showed that defendant had resumed the manufacture of the illegal drug. *Id*. at 995-96. *Garcia* specifically rejected the contention that the warrantless installation of the GPS device violated the fourth amendment. *Id*. at 996-98. The court held that "[t]he defendant's contention that by attaching the *** tracking device the police seized his car is untenable." *Id*. at 996. And there is no search in the attachment either. *Id*. at 996-97. In so holding, *Garcia* stated the following:

> "But if police follow a car around, or observe its route by means of cameras mounted on lampposts or of satellite imaging as in Google Earth, there is no search. Well, but the tracking in this case *was* by satellite. Instead of transmitting images, the satellite transmitted geophysical coordinates. The only difference is that in the imaging case nothing touches the vehicle, while in the case at hand the tracking device does. But it is a distinction without any practical difference." (Emphasis in original.) *Id*. at 997.

Thus, *Garcia* specifically authorized the police practice of attaching a GPS device to a vehicle without a warrant in the Seventh Circuit, which geographically includes Illinois.

¶ 57    Illinois law enforcement's reliance upon *Garcia* fits squarely within the specific holding of *Davis*, because it was "binding appellate precedent" in the absence of any contrary Illinois state authority as far as the Aurora police detective was concerned, who stood in exactly the same shoes as the Alabama police officer in *Davis* that relied upon binding Eleventh Circuit Court of Appeals precedent when he conducted a search in the course of investigating a state law traffic offense. Accordingly, suppression of the evidence is not warranted.

¶ 58    In *Davis*, local police officers in Greenville, Alabama, conducted a routine traffic stop that resulted in the arrest of the defendant, the driver of the vehicle, for a state DUI offense. *Davis*, 564 U.S. at ___, 131 S. Ct. at 2425. The defendant was handcuffed by police and placed in the back of the squad car. *Id*. at ___, 131 S. Ct. at 2425. Police then searched the passenger compartment of the vehicle and found a gun in the defendant's jacket. *Id*. at ___, 131 S. Ct. at 2425. Defendant was ultimately prosecuted in federal court on a firearm charge. *Id*. at ___, 131 S. Ct. at 2425-26.

¶ 59    Even after a defendant has stepped out of the vehicle and has been subdued by police, the prevailing understanding among courts was that *New York v. Belton*, 453 U.S. 454 (1981), had set down a bright-line rule, authorizing searches incident to arrest regardless of the location of the arrestee at the time of the search. *Davis*, 564 U.S. at ___, 131 S. Ct. at 2424. The federal district court in *Davis* denied the motion to suppress based on *Belton*. However, while the case was pending on appeal, the Supreme Court decided *Arizona v. Gant*, 556 U.S. 332 (2009),

- 15 -

which upset the prevailing interpretation of *Belton*. Before *Gant*, the Eleventh Circuit had been one of many federal appeals courts to read *Belton* permissively so as to allow searches of the vehicle even after the suspects were handcuffed and placed under arrest. See *United States v. Gonzalez*, 71 F.3d 819, 822 (11th Cir. 1996) (allowing search pursuant to *Belton* where the suspect was already arrested and handcuffed). When the *Davis* case reached the Supreme Court, it consequently became necessary to resolve the question of "whether to apply the exclusionary rule when the police \*\*\* [rely upon] binding judicial precedent." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2428.

¶ 60    As noted, the Supreme Court found the Eleventh Circuit precedent in *Gonzalez* to be "binding appellate precedent" for the local Alabama police officers who were conducting a routine traffic stop and investigating a purely state traffic offense when they decided to conduct a search in objectively reasonable reliance upon *Gonzalez*.[5] *Davis*, 564 U.S. at ___, 131 S. Ct. at 2428. As we have emphasized throughout this opinion, absolutely crucial to the decision in *Davis* was the lack of police culpability. It is hard to fathom, then, how the Aurora police officer in the present case—who could have reasonably relied upon *Garcia* as a case directly on point, which was followed to "the letter"—could be considered to be in any different position than the Alabama officers in *Davis*, who relied upon *Gonzalez*, which was followed to the letter. There appears to be no principled basis on which to distinguish *Davis* from the present case, and defendant has not offered one.

¶ 61    The only reason defendant offers for not applying the good-faith exception based on reliance upon *Garcia* is that in the present case, "[t]here is no indication in the record that police were doing anything other than investigating a state offense, and [defendant] was ultimately charged in state court." But that is the exact same situation as *Davis*, where state police officers were investigating a state crime they had no reason to believe would be prosecuted in federal court. As *Davis* itself shows, in the initial stages of a criminal investigation, it is not clear whether the conduct being investigated will end up supporting a violation of state law, federal law, or both. Moreover, the decision as to which court to bring the charges, federal or state, is almost certainly never made by the investigating officer. See *Stephens*, 764 F.3d at 338 n.13. Surely, the decision in *Davis* cannot be read to rest on the fortuitous and conceptually irrelevant distinction that—after the search was already undertaken and without knowing what it would produce—Davis's weapon charge could be prosecuted in federal court whereas the robbery charge here could not. We decline the invitation to presume that the Supreme Court intended such an absurd result.

¶ 62    As a final matter, we address the dissent's claim that we have made a "deeply troubling departure" from the holding in *People v. Krueger*, 175 Ill. 2d 60 (1996), and *People v. Madison*, 121 Ill. 2d 195 (1988), by recognizing the good-faith exception of *Davis*. The dissent is clearly mistaken in its belief that *Krueger* and *Madison* are at odds with the outcome in the present case.

¶ 63    In *Krueger*, this court first addressed the constitutionality of an Illinois statute that allowed police to enter a home without first knocking and announcing their office where a warrant had

---

[5]At the time the Alabama police officers conducted their search of the vehicle in *Davis*, the Alabama Supreme Court had not specifically addressed the location of the arrestee at the time of arrest. See *Gundrum v. State*, 563 So. 2d 27, 28 (Ala. Crim. App. 1990) (noting that its state supreme court had not addressed the issue).

- 16 -

been issued pursuant to the no-knock provision contained in the statute. Specifically, the statute allowed a no-knock entry if the occupant of the building had possessed a firearm "within a reasonable time period." *People v. Krueger*, 175 Ill. 2d at 64; 725 ILCS 5/108-8(b)(2) (West 1994). This court began by noting that the search and seizure clauses of both the federal and state constitutions should be measured using the same standard. *Krueger*, 175 Ill. 2d at 65 (which held that any variance between the Supreme Court's construction of the fourth amendment and similar provisions in the Illinois Constitution must be based on language in our state constitution, or the debates or committee reports of the constitutional convention, that indicate that the provisions of our state constitution are intended to be construed differently than the provisions of the federal constitution after which they are patterned) (citing *People v. Tisler*, 103 Ill. 2d 226, 235-36 (1984)). Relying upon *Wilson v. Arkansas*, 514 U.S. 927 (1995), and *People v. Condon*, 148 Ill. 2d 96, 101 (1992), *Krueger* found that although a no-knock entry can be constitutionally permitted if exigent circumstances are present, simple possession of firearms by the occupant without more does not qualify. *Krueger* rejected the argument that it would decrease the danger to officers to dispense with the usual requirements of knocking and announcing. *Krueger*, 175 Ill. 2d at 67-68. This court noted that in a situation where the occupant is not known to be violent, it might actually increase the risk of harm to the officers when the occupant is threatened by a completely unexpected and unannounced entry. *Id*. at 68-69.

¶ 64   After finding that the statutory provision in question was unconstitutional, *Krueger* then turned to the question of whether the evidence seized from the defendant's home pursuant to the unconstitutional statute should be excluded from trial. The State urged this court to adopt *Illinois v. Krull*, 480 U.S. 340 (1987), where the Supreme Court applied the good-faith exception to the exclusionary rule in the specific instance of a police officer having relied, in good faith, on a statute that authorized a warrantless administrative search, but the statute was later declared unconstitutional. *Krueger*, 175 Ill. 2d at 70-71. *Krueger* recognized that *Krull* was controlling as a matter of federal constitutional law, but *Krueger* nevertheless held that "the exclusionary rule arising out of our state constitution (Ill. Const. 1970, art. I, § 6) continues to afford the protection abrogated by *Krull*." *Id*. at 73-74.

¶ 65   In departing from the lockstep doctrine of following Supreme Court decisions in fourth amendment cases, *Krueger* referred to this state's particular history with respect to the exclusionary rule's application to evidence obtained under an *unconstitutional statute*:

> "[Our] exclusionary rule has always been understood to bar evidence gathered under the authority of an unconstitutional statute (see *Brocamp*, 307 Ill. 448, (adopting the reasoning in *Weeks* for purposes of our state exclusionary rule); *Weeks*, 232 U.S. at 394, 58 L. Ed. at 656, 34 S. Ct. at 345 (making it clear that the federal exclusionary rule was intended to apply to evidence gathered by officers acting under 'legislative *** sanction')), so long as that statute purported to authorize an unconstitutional search or seizure (see *Michigan v. DeFillippo*, 443 U.S. 31, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979) (recognizing a substantive-procedural distinction not at issue here; specifically holding that the fourth amendment exclusionary rule did not apply where an ordinance was held unconstitutional on vagueness grounds)). Consequently, to adopt *Krull*'s extended good-faith exception would drastically change this state's constitutional law." *Id.* at 74-75.

- 17 -

¶ 66    From the foregoing, it is crystal clear that *Krueger* held only that the good-faith exception as expressed in *Krull*—which dealt only with an officer's reliance upon a *statute* later declared unconstitutional—would not be recognized in Illinois for purposes of our state constitution. *Krueger* therefore has no application to the present case where an officer could have reasonably relied in objective good faith on binding appellate judicial decisions and the constitutional norm that had been established thereby. This is further borne out by *Krueger*'s heavy reliance upon Justice O'Connor's dissenting opinion in *Krull* arguing that " 'the core concern' " of the framers of the fourth amendment was the enactment of unconstitutional statutes by the legislative branch. *Id.* at 72 (quoting *Krull*, 480 U.S. at 362-63 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.)). *Krueger* further noted that Justice O'Connor found this history illustrative of the fact that the relevant state actors in *Krull*—legislators—often pose a serious threat to fourth amendment values and that this presented a clear distinction from the situation in *United States v. Leon*, 468 U.S. 897 (1984), where a judicial officer issues a warrant that is not supported by probable cause. *Krueger*, 175 Ill. 2d at 72. We find that the same threat to fourth amendment values that was of concern in *Krueger* is not present when police reasonably rely in objective good faith on judicial precedent. Nor is there any concern here of a "grace period" giving effect to the operation of an unconstitutional legislative act.

¶ 67    Finally, *Krueger* expressly reaffirmed that this court would continue to accept both the good-faith exception as expressed in *Leon* and the rationale used to support it. Notably, *Krueger* did not imply that it would refuse to follow any further expansion or a different articulation of the good-faith exception made by the Supreme Court in future cases.

¶ 68    Given the actual rationale and holding of *Krueger*, it is no surprise that defendant did not argue before this court that it controlled the outcome here. The dissent's treatment of it obviously misses the mark.

¶ 69    The same can be said for the dissent's unsolicited reliance upon *Madison*. In that case, the plain language of the statute required police to obtain a warrant before searching and seizing evidence discovered during an administrative inspection. *Madison*, 121 Ill. 2d at 201. The *Madison* court noted that the problem with the State's argument for application of the good-faith exception was that "[t]he officers were acting in defiance of, not reliance on," the plain words of the statute when they conducted their warrantless search and seizure. *Id*. at 208. Such conduct cannot be considered objectively reasonable, and therefore the dissent's use of *Madison* to support its position is puzzling. *Madison* would be instructive if, in the present case, police had defied the plain language of an existing statute or judicial ruling and substituted their own erroneous interpretation. But that of course is not the case here. In trying to fit a square peg into a round hole, the dissent seems to purposely ignore that the good-faith exception has an objective reasonableness component. See *Davis*, 564 U.S. at___, 131 S. Ct. at 2423-24 ("searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"); see also *Katzin*, 769 F.3d at 176 (reliance is reasonable "when the conduct under consideration clearly falls within rationale espoused in binding appellate precedent, which authorizes nearly identical conduct").

¶ 70                                            CONCLUSION

¶ 71        We hold that the good-faith exception applies and that the evidence obtained against defendant should not be excluded. We find *Knotts*, *Karo* and *Garcia* to be "binding appellate precedent" within the meaning of *Davis* and that Aurora police could have reasonably relied upon such precedent in placing and using the GPS device in 2009. In the alternative, we further find that it would have been objectively reasonable for police to rely upon the legal landscape and the constitutional norm that had been established at the time of the search that allowed warrantless attachment and use of GPS technology. In so doing, we conclude that there was a complete lack of police culpability in this case and that there would be little or no deterrent value to suppressing the evidence. At the same time, the cost to society of letting a clearly guilty repeat offender go free is too great and the exclusionary rule cannot pay its way in this case. Finally, we caution that after *Jones* law enforcement should beware of its holding and how it relates to GPS attachment and monitoring.

¶ 72        For the foregoing reasons, we affirm the appellate court's remand for a new trial because of the Rule 401(a) violation. However, we reverse the portion of the appellate court's judgment that vacated the trial court's order denying defendant's motion to quash arrest and suppress evidence. We also reverse the portion of the appellate court's judgment that remanded the cause for further proceedings on defendant's motion.

¶ 73        Appellate court affirmed in part and reversed in part.

¶ 74        Circuit court affirmed in part and reversed in part.

¶ 75        Cause remanded.

¶ 76        JUSTICE BURKE, dissenting:

¶ 77        In a deeply troubling departure from this court's constitutional precedent, the majority now recognizes for purposes of our state exclusionary rule the "good-faith" exception to the federal exclusionary rule set forth by the United States Supreme Court in *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419 (2011). Under *Davis*, when, in good faith, the police conduct an unconstitutional search based on their objectively reasonable reliance on "binding appellate precedent" which is later overruled, evidence resulting from the search is not subject to the federal exclusionary rule. *Id.* at ___, 131 S. Ct. at 2423-24. Applying *Davis* to the facts before this court, the majority holds that the good-faith exception applies because binding appellate precedent at the time of the search authorized the warrantless installation of a GPS device on the vehicle driven by defendant. Alternatively, the majority holds that the evidence obtained from the GPS device is not subject to suppression because the police reasonably relied upon persuasive, nonbinding precedent from other jurisdictions. In applying the good-faith exception, the majority unfortunately chooses not to resolve the issue at the heart of this case—the constitutionality of warrantless GPS tracking of a suspect by the police.

¶ 78        I disagree with the decision reached by the majority in several respects. First, the majority's extension of the good-faith exception in *Davis* to our state exclusionary rule is directly at odds with *People v. Krueger*, 175 Ill. 2d 60 (1996), where we refused to recognize a good-faith exception for searches conducted in objectively reasonable reliance on a statute which is later held to be unconstitutional. In *Krueger*, we held that the good-faith exception was incompatible with the exclusionary rule arising out of our state constitution. We

interpreted our exclusionary rule as providing greater protection of a citizen's right to be free from unconstitutional searches and seizures than the federal exclusionary rule. *Id*. at 73-76. For reasons similar to those set forth in *Krueger*, I would decline the State's request to recognize the *Davis* good-faith exception for searches conducted in reasonable reliance on binding appellate precedent.

¶ 79    The majority's alternative holding, based on a broad reading of *dicta* in *Davis*, amply demonstrates why this court should reject *Davis* as contrary to the Illinois exclusionary rule. The majority goes well beyond the holding in *Davis* and finds that the good-faith exception applies to searches conducted in the absence of any binding precedent where the police reasonably rely on the prevailing "legal landscape." The majority also invites the lower courts to conduct a general "good-faith inquiry" which is not limited to the specific circumstances in *Davis* or any other Supreme Court case. By reading into *Davis* a much broader good-faith exception than the one delineated in the Court's holding, the majority affords less protection to the rights of Illinois citizens to be free from unconstitutional searches and seizures than intended by the Supreme Court. The result will be the erosion, and possible destruction, of the exclusionary rule in this state.

¶ 80    Lastly, I disagree with the majority that, at the time the police officers installed the GPS device and used it to monitor the vehicle's movements, there was any relevant, binding authority which could have authorized their conduct. The case law cited by the majority is either inapposite or was not binding on Illinois state courts. For these reasons, I respectfully dissent.

¶ 81                                  BACKGROUND

¶ 82    In 2009, the Aurora police covertly installed a GPS device on a vehicle defendant was known to drive for the purpose of tracking defendant's movements in the vehicle. The police did not obtain a warrant prior to installing the GPS device. Location data from the GPS device was used to connect defendant to a gas station robbery which took place approximately 24 hours after the device was installed. Defendant was subsequently arrested and charged with aggravated robbery, robbery, and burglary. His motion to quash arrest and suppress the evidence gleaned from the GPS tracker was denied, and he was convicted of all charges.

¶ 83    While defendant's appeal was pending in the appellate court, the United States Supreme Court decided *United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945 (2012). The *Jones* Court held that the government's installation of a GPS device on a suspect's vehicle, and its use of the device to monitor the vehicle's movements, constitutes a search under the fourth amendment (U.S. Const., amend. IV). *Jones*, 565 U.S. at ___, 132 S. Ct. at 949. Taking *Jones* into consideration, the appellate court below held that a fourth amendment search took place when the police attached the GPS device to the vehicle and used it to track defendant's movements. 2013 IL App (2d) 100659, ¶ 13. Accordingly, the appellate court vacated the trial court's order denying defendant's motion to quash arrest and suppress evidence. The court then remanded the matter for a new suppression hearing to determine whether defendant had a

sufficient possessory interest in the vehicle to raise a constitutional claim under *Jones. Id.* ¶ 29.[6]

¶ 84　　Addressing the State's appeal of that judgment, the majority now declines to consider whether defendant had a sufficient possessory interest in the vehicle to challenge the search under *Jones*, or even whether an unconstitutional search took place in the first instance. *Supra* ¶ 18. Instead, the majority finds that the good-faith exception in *Davis* applies because the police installed the GPS device in objectively reasonable reliance on the "legal landscape" in existence at that time, or, alternatively, on binding appellate precedent authorizing the installation. *Supra* ¶ 31. The majority thus finds that defendant is not entitled to a new suppression hearing because, even if an unconstitutional search took place, any evidence resulting from the search would be admitted upon retrial.

¶ 85　　　　　　　　　　　　　　　　ANALYSIS

¶ 86　　　　　　　　I. *The Davis Good-Faith Exception Is Incompatible*

*With Our State Exclusionary Rule*

¶ 87　　The United States Supreme Court first recognized a limited "good-faith" exception to the federal exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court held that the fourth amendment exclusionary rule does not bar evidence obtained by a police officer who reasonably relies, in objective good faith, on a search warrant issued by a neutral and detached magistrate, but which is later found to be unsupported by probable cause. *Id.* at 919-22. The Court reasoned that application of the exclusionary rule in this situation would not serve the primary purpose of the rule, which is to deter future police misconduct. *Id.* at 918-21. This court recognized the *Leon* good-faith exception for purposes of the state exclusionary rule in *People v. Stewart*, 104 Ill. 2d 463, 477 (1984); see also *People v. Turnage*, 162 Ill. 2d 299 (1994) (applying *Leon*).

¶ 88　　The Supreme Court extended *Leon* to a warrantless search for the first time in *Illinois v. Krull*, 480 U.S. 340 (1987). *Krull* held that the federal exclusionary rule does not bar evidence seized by a police officer who reasonably relies, in objective good faith, on a statute authorizing a warrantless administrative search, where the statute is later held to be unconstitutional. *Id.* at 349-50. In *People v. Krueger*, 175 Ill. 2d 60 (1996), however, this court declined to recognize *Krull*'s expansion of the *Leon* good-faith exception as a matter of state constitutional law.

¶ 89　　In *Krueger*, police officers executed a search warrant issued pursuant to a "no-knock" statute (725 ILCS 5/108-8(b) (West 1994)), which this court held was unconstitutional under both the fourth amendment and article I, section 6, of the Illinois Constitution of 1970. *Krueger*, 175 Ill. 2d at 69-70. The State argued that we should reverse the circuit court's suppression order pursuant to the *Krull* good-faith exception. We rejected the State's argument, holding that the exclusionary rule arising from article I, section 6, provides greater protection from unconstitutional searches and seizures than the federal exclusionary rule. *Id.* at 73-74. We observed that this court has the authority to interpret state constitutional provisions

---

[6]The appellate court also reversed defendant's convictions and remanded the matter for a new trial based on improper Illinois Supreme Court Rule 401(a) admonishments. The majority affirms this part of the appellate court's judgment.

more broadly than the Supreme Court interprets similar provisions of the federal constitution. *Id.* at 74 (citing *People v. Perry*, 147 Ill. 2d 430, 436 (1992)). We also noted that the exclusionary rule is a judicially created remedy with a long history in Illinois, traced back to *People v. Brocamp*, 307 Ill. 448 (1923). In *Brocamp*, this court adopted an independent state exclusionary rule almost 40 years before *Mapp v. Ohio*, 367 U.S. 643 (1961), made the federal exclusionary rule applicable to the states. *Krueger*, 175 Ill. 2d at 74-75. See also *Illinois v. Gates*, 462 U.S. 213, 221-22 (1983); *id.* at 251 (White, J., concurring) (a state court may rest a decision to modify its state exclusionary rule on adequate and independent state grounds).

¶ 90    In rejecting *Krull* as a matter of state law, we balanced the legitimate aims of law enforcement against the right of our citizens to be free from unreasonable governmental intrusion. We found that the citizens' rights prevailed, holding:

> "[w]e are not willing to recognize an exception to our state exclusionary rule that will provide a grace period for unconstitutional search and seizure legislation, during which time our citizens' prized constitutional rights can be violated with impunity. We are particularly disturbed by the fact that such a grace period could last for several years and affect large numbers of people. This is simply too high a price for our citizens to pay. We therefore conclude that article I, section 6, of the Illinois Constitution of 1970 prohibits the application of *Krull*'s extended good-faith exception to our state exclusionary rule." *Krueger*, 175 Ill. 2d at 75-76.

¶ 91    Our decision in *Krueger* relied on the reasoning set forth in Justice O'Connor's dissent in *Krull*. See *id.* at 72-73. Justice O'Connor criticized the *Krull* majority's extension of the *Leon* good-faith exception, arguing that this newly created exception was not supported by the rationale in *Leon*. *Id.* at 72 (citing *Krull*, 480 U.S. at 361 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.)). First, she observed that, in contrast to a search authorized by a facially valid warrant later found to be defective, there was a " 'powerful historical basis for the exclusion of evidence gathered pursuant to a search authorized by an unconstitutional statute.' " *Id.* (quoting *Krull*, 480 U.S. at 362 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.)). Second, Justice O'Connor argued that legislators were much more likely to pose a threat to fourth amendment protections than a neutral magistrate issuing a search warrant in a specific case. She noted:

> " 'Judicial authorization of a particular search does not threaten the liberty of everyone, but rather authorizes a single search under particular circumstances. The legislative act, on the other hand, sweeps broadly, authorizing whole classes of searches, without any particularized showing. A judicial officer's unreasonable authorization of a search affects one person at a time; a legislature's unreasonable authorization of searches may affect thousands or millions and will almost always affect more than one. Certainly the latter poses a greater threat to liberty.' " *Id.* at 72-73 (quoting *Krull*, 480 U.S. at 365 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.)).

¶ 92    Moreover, Justice O'Connor observed that the majority's decision was at odds with the retroactivity principles in *Griffith v. Kentucky*, 479 U.S. 314 (1987), which held that " 'basic norms of constitutional adjudication' and fairness to similarly situated defendants" required that opinions announcing new constitutional rules in criminal cases apply to all cases pending on direct review at the time the new rule is declared. *Krull*, 480 U.S. at 368 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.) (quoting *Griffith*, 479 U.S. at 322).

Justice O'Connor pointed out that, under the novel approach taken by the *Krull* majority, " 'no effective remedy is to be provided in the very case in which the statute at issue was held unconstitutional.' " *Krueger*, 175 Ill. 2d at 73 (citing *Krull*, 480 U.S. at 368 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.)). As Justice O'Connor noted, "the lack of a remedy leaves no incentive for the aggrieved defendant to challenge the statute as unconstitutional." *Id.* (citing *Krull*, 480 U.S. at 369 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.)).

¶ 93    The same flaws identified by this court in *Krueger* with respect to the *Krull* good-faith exception are inherent in the good-faith exception for police searches "conducted in objectively reasonable reliance on binding appellate precedent" (*Davis*, 564 U.S. at ___, 131 S. Ct. at 2423-24), applied by the majority in the case at bar. Under both good-faith exceptions, the police are said to have reasonably relied on existing authority (an authorizing statute in *Krull*; binding appellate authority in *Davis*), which is later found to be unconstitutional or overruled by subsequent case law. In both situations, there is a "grace period," which could last several years, during which the state is free to perform unconstitutional searches and seizures with impunity. See *Krueger*, 175 Ill. 2d at 75; *Krull*, 480 U.S. at 361 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.). Just as in *Krull*, the *Davis* good-faith exception has the potential to affect thousands of people by authorizing a whole class of searches, in contrast to a single search authorized by a defective search warrant. See *Krueger*, 175 Ill. 2d at 72-73; *Krull*, 480 U.S. at 365 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.). Moreover, under both *Krull* and *Davis*, the lack of a remedy leaves no incentive for a defendant to challenge a statute as unconstitutional or to seek to overturn case law authorizing an unconstitutional search. See *Krueger*, 175 Ill. 2d at 73; *Krull*, 480 U.S. at 368 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.); see also *Davis*, 564 U.S. at ___, 131 S. Ct. at 2438 (Breyer, J., dissenting, joined by Ginsburg, J.) (criticizing the *Davis* majority for adopting a good-faith exception at odds with retroactivity principles and arguing that a defendant has little incentive to challenge court precedent). Finally, unlike *Leon*, which "simply instructs courts that police officers may rely upon a facially valid search warrant," the good-faith exceptions in *Krull* and *Davis* are difficult for courts to administer because it is "not apparent how much constitutional law the reasonable officer is expected to know." *Krull*, 480 U.S. at 366-67 (O'Connor, J., dissenting, joined by Brennan, Marshall and Stevens, JJ.); see also *Davis*, 564 U.S. at ___, 131 S. Ct. at 2437 (Breyer, J., dissenting, joined by Ginsburg, J.) (application of the *Davis* good-faith exception will result in "complex legal argument and police force confusion").

¶ 94    This court noted in *Krueger* that *Krull* had been severely criticized by fourth amendment scholars. See *Krueger*, 175 Ill. 2d at 76 (citing 1 Wayne R. LaFave, Search and Seizure § 1.3(h), at 96-99 (3d ed. 1996)). *Davis* also has received sharp criticism from legal scholars for its potential to erode, or even nullify, the federal exclusionary rule. See 1 Wayne R. LaFave, Search and Seizure § 1.3(h), at 132-46 (5th ed. 2012); George M. Dery III, *"This Bitter Pill": The Supreme Court's Distaste for the Exclusionary Rule in Davis v. United States Makes Evidence Suppression Impossible to Swallow*, 23 Geo. Mason U. Civ. Rts. L.J. 1, 19-23 (2012); James J. Tomkovicz, *Davis v. United States: The Exclusion Revolution Continues*, 9 Ohio St. J. Crim. L. 381, 400-02 (2011); David A. Moran, *Hanging on by a Thread: The Exclusionary Rule (or What's Left of It) Lives for Another Day*, 9 Ohio St. J. Crim. L. 363, 375-80 (2011). Several state courts already have rejected *Davis* on state law grounds. See, *e.g.*,

*Brown v. State*, 767 S.E.2d 299, 302-03 (Ga. Ct. App. 2014); *State v. Anderson*, 445 S.W.3d 895, 912 (Tex. App. 2014); *State v. Koivu*, 272 P.3d 483, 518-19 (Idaho 2012).

¶ 95　　The majority's recognition of the *Davis* good-faith exception in this case is totally at odds with *Krueger*, where this court held that our state exclusionary rule provides greater protection of our citizens' constitutional rights than the federal exclusionary rule. I cannot see a way to reconcile today's decision with *Krueger*. I would find that *Krueger* precludes this court from adopting the *Davis* good-faith exception for purposes of our state exclusionary rule, and thus, that defendant is entitled to a new suppression hearing.

¶ 96　　　　　　　　　II. *The Majority's "Good-Faith Inquiry" and "Legal Landscape"*
*Theories Are Not Supported by the Narrow Holding in Davis*

¶ 97　　Even if I agreed that the *Davis* good-faith exception should be extended to the exclusionary rule arising out of article I, section 6, of the Illinois Constitution, I could not sign on to the majority's alternative holding in this case. The majority finds that the good-faith exception in *Davis* is not limited to "objectively reasonable reliance on binding appellate precedent." See *Davis*, 564 U.S. at ___, 131 S. Ct. at 2423-24. According to the majority, in the absence of any binding precedent authorizing the actions of the police:

> "[i]t would still be necessary to conduct the 'good-faith inquiry' and consider 'whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.' [Citation.] Clearly, application of the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court in *Davis* or in any other Supreme Court case. [Citation.] The Supreme Court has found the exclusionary rule to be inapplicable in a variety of settings after undertaking the good-faith analysis, and the fact that a court might apply the good-faith exception in a new context not yet addressed by the Supreme Court does not mean that it is creating a 'new, freestanding exception' to the exclusionary rule. [Citations.]
>
> * * *
>
> *** [W]e find in the alternative that, pursuant to the Supreme Court's general good-faith analysis, the police conduct in relying on the legal landscape that existed at the time was objectively reasonable and a reasonable officer had no reason to suspect that his conduct was wrongful under the circumstances." *Supra* ¶ 29.

¶ 98　　I disagree with both aspects of the majority's alternative holding: (1) that the Supreme Court's good-faith decisions contemplate a general "good-faith inquiry" not limited to the specific circumstances in those decisions; and (2) that, in the absence of binding appellate precedent, the good-faith exception applies to a search conducted in objectively reasonable reliance on the existing "legal landscape."

¶ 99　　First, the authority the majority cites for the proposition that the "good-faith inquiry" is not limited to the specific circumstances in *Davis*, or in any other Supreme Court case, is a decision of the United States Court of Appeals for the Fourth Circuit (*United States v. Stephens*, 764 F.3d 327, 338 (4th Cir. 2014)), which, obviously, is not binding on this court. See *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 398 (1992). I do not find the reasoning in that case to be persuasive. The Supreme Court has, thus far, taken great care to limit application of the good-faith exception to specific, atypical searches involving reasonable reliance by the police. See *United States v. Leon*, 468 U.S. 897 (1984) (later-invalidated

- 24 -

warrant); *Illinois v. Krull*, 480 U.S. 340 (1987) (subsequently overturned statute); *Arizona v. Evans*, 514 U.S. 1 (1995) (error in court-maintained database); *Herring v. United States*, 555 U.S. 135 (2009) (error in police-maintained database); *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419 (2011) (later-reversed binding appellate precedent). In my view, these decisions should be read narrowly and their holdings limited to the particular factual scenarios before the Court. Warrantless searches generally are considered *per se* unreasonable unless they fall within " 'a few specifically established and well-delineated exceptions.' " *People v. Galvin*, 127 Ill. 2d 153, 169-70 (1989) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The majority's adoption of a "general good-faith analysis" (*supra* ¶ 31) under which evidence resulting from an unconstitutional search will be admitted in the absence of gross negligence by the police, regrettably turns the exception into the rule. See *United States v. Katzin*, 769 F.3d 163, 189-90 (3d Cir. 2014) (*en banc*) (Greenaway, J., dissenting, joined by McKee, C.J., and Ambro, Fuentes, and Smith, JJ.).

¶ 100   Under the majority's reasoning, police officers are authorized to conduct warrantless searches based solely on their own good judgment about the existence of probable cause, and, if they are wrong, the evidence will almost never be suppressed. The alarming scope of the majority's alternative holding is exactly why this court rejected the *Krull* good-faith exception in *Krueger*. We feared that the good-faith exception would weaken our state exclusionary rule by leaving citizens without a remedy for constitutionally invalid searches and seizures. The dissenters in *Davis* echoed this concern with respect to the federal exclusionary rule.

> "[A]n officer who conducts a search that he believes complies with the Constitution but which, it ultimately turns out, falls just outside the Fourth Amendment's bounds is no more culpable than an officer who follows erroneous 'binding precedent.' Nor is an officer more culpable where circuit precedent is simply suggestive rather than 'binding,' where it only describes how to treat roughly analogous instances, or where it just does not exist. Thus, if the Court means what it now says, if it would place determinative weight upon the culpability of an individual officer's conduct, and if it would apply the exclusionary rule only where a Fourth Amendment violation was 'deliberate, reckless, or grossly negligent,' then the 'good faith exception' will swallow the exclusionary rule. ***
>
> Any such change (which may already be underway) would affect not 'an exceedingly small set of cases,' [citation] but a very large number of cases, potentially many thousands each year. [Citation.] And since the exclusionary rule is often the only sanction available for a Fourth Amendment violation, the Fourth Amendment would no longer protect ordinary Americans from 'unreasonable searches and seizures.' [Citations.] It would become a watered-down Fourth Amendment, offering its protection against only those searches and seizures that are *egregiously* unreasonable." (Emphasis in original.) *Davis*, 564 U.S. at ___, 131 S. Ct. at 2438-40 (Breyer, J., dissenting, joined by Ginsburg, J.).

¶ 101   The majority's expansion of the *Davis* good-faith exception also runs afoul of this court's holding in *People v. Madison*, 121 Ill. 2d 195 (1988), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). In *Madison*, 121 Ill. 2d at 207-08, police officers conducted a warrantless inspection of a salvage yard pursuant to an authorizing provision in the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, ¶ 5-403). The officers then seized 26 incomplete

certificates of vehicle title without first obtaining a search warrant, despite statutory language stating that a warrant was required. The owner of the salvage yard was charged with possession of the incomplete titles. At trial, the defendant's motion to suppress the evidence was granted, and the case was dismissed. The appellate court affirmed. This court affirmed the lower courts. *Madison*, 121 Ill. 2d at 211. We first held that the plain language of section 5-403 of the Vehicle Code required police officers to obtain a warrant before seizing evidence in the course of a valid administrative search. *Id.* at 200-06. Because the officers seized the titles without a warrant, the evidence was illegally obtained and subject to suppression. The State next argued that the evidence, even if illegally obtained, was not subject to the exclusionary rule because the officers relied, in good faith, on their own interpretation of the statute. We rejected the State's invitation to extend the good-faith exceptions in *Leon* and *Krull* to these circumstances. We said that the officers were acting in defiance of, not reliance on, the language in the authorizing statute. *Id.* at 208. Moreover, we held:

> "to adopt the extension of the good-faith exception proposed by the State would essentially eviscerate the exclusionary rule as it is currently enforced. Police officers would be encouraged to defy the plain language of statutes as written in favor of their own interpretations in conducting searches and seizures. Such a proposal, giving the police unlimited authority to conduct searches and seizures until specifically restricted by the legislature or the courts, is fundamentally at odds with the central purpose of deterring police misconduct which underlies the exclusionary rule." *Id.*

¶ 102 Thus, this court in *Madison* expressly refused to recognize an extension of the good-faith exception, reasoning that such an extension would eviscerate our state exclusionary rule by encouraging police officers to rely on their own interpretations of statutes rather than seek to obtain a warrant. In contravention of what we said in *Madison*, the majority now recognizes a general exception to the exclusionary rule, whereby an officer's interpretation of a statute or case law, if made in "good faith," would prevent the exclusion of evidence. Today's decision is a radical departure from our settled case law in both *Krueger* and *Madison*, which the majority does not reconcile.

¶ 103 Under the second part of the majority's alternative holding, the majority rules that, in the absence of binding appellate precedent authorizing a search, *Davis* allows a good-faith exception for searches conducted in reasonable reliance on the "legal landscape" that existed at the time the search was conducted. *Supra* ¶¶ 31, 51. The majority identifies only two cases decided prior to April 23, 2009, which might have justified the officers' actions at the time of the search. See *supra* ¶ 52 (citing *United States v. Garcia*, 474 F.3d 994, 996-98 (7th Cir. 2007), and *United States v. McIver*, 186 F.3d 1119, 1126-27 (9th Cir. 1999)). These two nonbinding decisions were, in the majority's view, sufficient to comprise the prevailing "legal landscape" upon which the police could have reasonably relied in conducting their warrantless search.[7]

---

[7]The majority states that the Supreme Court's "beeper" cases, *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984), were "widely and reasonably understood to stand for the proposition that the fourth amendment was simply not implicated by electronic surveillance of automotive movements." *Supra* ¶ 52. However, most of the federal court opinions referenced by the majority were decided *after* the search in this case took place, and, thus, could not have been relied upon by the Aurora police.

- 26 -

¶ 104    The majority's "legal landscape" theory is directly at odds with *Davis*, which contains multiple, repeated references to the officers' reasonable reliance on "binding" precedent. *Davis* recognized a narrow exception, whereby "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2423-24. The Court found that the officers' search of the defendant incident to his arrest "followed the Eleventh Circuit's *Gonzalez* precedent to the letter." *Id*. at ___, 131 S. Ct. at 2428. The Court emphasized that the officers strictly complied with "then-binding Circuit law" and "scrupulously adhered to governing law" in the Eleventh Circuit. *Id*. at ___, ___, 131 S. Ct. at 2428, 2434. Furthermore, in the course of explaining that its acceptance of a good-faith exception would not deter defendants from challenging existing fourth amendment doctrine in future cases, the Court noted that "defendants in *jurisdictions in which the question remains open* will still have an undiminished incentive to litigate the issue." (Emphasis added.) *Id*. at ___, 131 S. Ct. at 2433. See also *Davis*, 564 U.S. at ___, 131 S. Ct. at 2435 (Sotomayor, J., concurring in the judgment) (noting that "[t]his case does not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled"). *Davis* thus recognized that its holding was limited to jurisdictions which clearly authorized the officers' conduct.

¶ 105    The majority's alternative holding is an alarming and unwarranted expansion of the carefully circumscribed good-faith exception in *Davis*. There are no references in *Davis* to "generally accepted authority," "legal landscape," or persuasive or well-reasoned precedent. See *United States v. Ortiz*, 878 F. Supp. 2d 515, 539-40 (E.D. Pa. 2012). See also *United States v. Martin*, 712 F.3d 1080, 1081-82 (7th Cir. 2013) (*per curiam*) (where there was no binding appellate precedent in the Eighth Circuit at the time that Iowa law enforcement officers attached a GPS device to the defendant's car, the court declined to expand *Davis* to allow police to rely on "a diffuse notion of the weight of authority around the country"). Accordingly, the majority's holding that the *Davis* good-faith exception applies based on the officers' objectively reasonable reliance on the "legal landscape" is a deliberate misreading of *Davis*.

¶ 106    The majority's alternative holding is troubling for the additional reason that it signifies this court's abandonment of its duty to decide constitutional issues and shifts such decisionmaking to the police. Based on its application of the *Davis* good-faith exception, the majority declines to consider the important constitutional issues raised in this appeal. At the time of the search in this case, there was no binding precedent in Illinois with respect to warrantless, surreptitious GPS installation and monitoring. And because the majority refuses to address the constitutionality of GPS surveillance, there still is none. I fear that the majority's expansion of the good-faith doctrine will inevitably lead to the avoidance of meaningful analysis of the constitutionality of searches and seizures, particularly those involving new technology.

¶ 107                      III. *Knotts, Karo, and Garcia Were Not "Binding"*
                              *Authority Under Davis*

¶ 108    My final point of disagreement is with the majority's application of the *Davis* good-faith exception to the police officers' objectively reasonable reliance on *United States v. Knotts*, 460 U.S. 276 (1983), *United States v. Karo*, 468 U.S. 705 (1984), and *United States v. Garcia*, 474

F.3d 994 (7th Cir. 2007). None of these cases constitutes "binding" precedent within the meaning of *Davis*.

¶ 109    *Knotts* held that the use of a covert beeper device to monitor a vehicle's movements during a single journey did not amount to a search because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281-82, 285. The beeper was placed in a chloroform container with the consent of the container's owner before being transferred to the defendant. *Id*. at 278. The Court expressly left open the question of whether the warrantless installation of the device converted the subsequent tracking into a search. *Id*. at 279 n.*. See also *id*. at 286 (Brennan, J., concurring in the judgment, joined by Marshall, J.) ("I think this would have been a much more difficult case if respondent had challenged, not merely certain aspects of the monitoring of the beeper ***, but also its original installation."). Thus, *Knotts* did not "specifically authorize[ ]" the "particular police practice" (emphasis omitted) (*Davis*, 564 U.S. at ___, 131 S. Ct. at 2429) in this case—the installation of the GPS device on the Kia, and officers could not have reasonably relied on *Knotts* in their decision to install the device without a warrant.

¶ 110    *Karo* addressed the government's placement of a beeper device in a container of ether, which was sold to the respondents by a government informant and used to monitor them without respondents' knowledge. The Court held that the respondents had no legitimate expectation of privacy in the container because, at the time of the beeper's placement, the respondents did not own the container. *Karo*, 468 U.S. at 711. Because the container's owner consented to the beeper placement, the actual installation of the beeper violated no one's fourth amendment rights. *Id*. The Court went on to hold that the transfer of the beeper-laden can to the respondents did not constitute a search because it conveyed no information that respondents wished to keep private and, thus, infringed no privacy interests. *Id*. at 712. Nor did the transfer constitute a seizure, because there was no "meaningful interference with an individual's possessory interests" in the property. (Internal quotation marks omitted.) *Id*. As in *Knotts*, the *Karo* Court "did not consider a scenario in which the government installs a tracking device on property that already belongs to the defendant." *United States v. Sparks*, 711 F.3d 58, 65 n.4 (1st Cir. 2013).

¶ 111    Neither *Knotts* nor *Karo* stands for the proposition that the warrantless installation of a tracking device onto a privately owned vehicle without the owner's consent is lawful under the fourth amendment. Therefore, the police in this case could not have reasonably relied on either of these cases to conclude that the nonconsensual installation of the GPS device was constitutionally authorized. Significantly, *United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945 (2012), in which the Court found that installation of a GPS device was a search, did not overrule either *Knotts* or *Karo* but distinguished them on the basis that neither case involved the nonconsensual installation of a tracking device onto private property. In other words, the Supreme Court expressly rejected the reading of those cases which the majority adopts here. See *id*. at ___, 132 S. Ct. at 951-52 (holding that a trespassory installation of a tracking device was not at issue in *Knotts* because the beeper was placed in the container with the consent of the then-owner, and Knotts did not challenge that installation); *id*. at ___, 132 S. Ct. at 952 (holding that the installation of the beeper in *Karo* was with the consent of the original owner; moreover, because "Karo accepted the container as it came to him, beeper and all, [he] was therefore not entitled to object to the beeper's presence. [Citation.] Jones, who possessed the

Jeep at the time the Government trespassorily inserted the information-gathering device, is on much different footing.")

¶ 112    The fact that the *Jones* Court distinguished *Knotts* and *Karo*, but did not overrule them, takes this case out of the *Davis* good-faith exception. In *Davis*, the police officers' search followed binding circuit precedent "to the letter," and, although that precedent was later overturned, the officers' conduct at the time of the search "was in strict compliance with then-binding Circuit law and was not culpable in any way." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2428. The complete absence of police culpability or deliberate misconduct "doom[ed] Davis's claim" because exclusion of the evidence would not yield any meaningful deterrence. *Id.* at ___, 131 S. Ct. at 2428-29. Under the Court's reasoning, where binding appellate authority "specifically *authorizes* a particular police practice" (emphasis in original) (*id.* at ___, 131 S. Ct. at 2429), exclusion of the evidence does not serve the purpose of deterring unconstitutional police conduct because the sole responsibility for the fourth amendment violation lies with the appellate judiciary and not with the police. When the police conduct a search in reliance on precedent that does not specifically authorize the particular practice, however, the exclusionary rule does provide meaningful deterrence. It deters law enforcement officers from taking the fourth amendment inquiry into their own hands by extrapolating from, or analogizing to, existing case law, instead of seeking a warrant from a neutral magistrate. See *United States v. Katzin*, 769 F.3d 163, 191-92 (3d Cir. 2014) (*en banc*) (Greenaway, J., dissenting, joined by McKee, C.J., and Ambro, Fuentes, and Smith, JJ.). The exclusionary rule also encourages law enforcement officials to "err on the side of constitutional behavior" in the face of unsettled or equivocal fourth amendment law. See *Davis*, 564 U.S. at ___, 131 S. Ct. at 2435 (Sotomayor, J., concurring in the judgment); *State v. Mitchell*, 323 P.3d 69, ¶ 31 (Ariz. Ct. App. 2014). "[T]he *Davis* requirement of 'binding appellate precedent' means that government agents should not be and need not be vested with discretion in predicting or anticipating how the law will develop and how it should be applied. *** The solution is simple: the import of *Davis* is that officers acting without clearly applicable binding appellate guidance should err on the side of caution and obtain a warrant." *United States v. Ortiz*, 878 F. Supp. 2d 515, 542 (E.D. Pa. 2012).

¶ 113    In contrast to *Davis*, where binding precedent explicitly authorized the officers' actions and the officers were not culpable in any way because they followed the Eleventh Circuit precedent "to the letter" (*Davis*, 564 U.S. at ___, ___, 131 S. Ct. at 2428, 2429), here there was no binding precedent which specifically authorized the police officers' conduct. See, *e.g.*, *id.* at ___, 131 S. Ct. at 2437 (Breyer, J. dissenting, joined by Ginsburg, J.) (*Davis* did not address officers' reliance on a decision with "clearly distinguishable" or "highly analogous" facts); *United States v. Sparks*, 711 F.3d 58, 64 (1st Cir. 2013) (*Davis* good-faith exception applies only to precedent that is "clear and well-settled"). Thus, there is no basis for holding that the police reasonably relied on *Knotts* or *Karo* as authorization for their installation of the GPS device without first obtaining a warrant or permission from the vehicle's owner.

¶ 114    The majority also holds that *Davis* applies because the Aurora police acted in objectively reasonable reliance on the Seventh Circuit's decision in *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007). *Garcia* held that the warrantless installation of a GPS tracking device on a vehicle in order to obtain information about a suspect's movements in the vehicle was not a fourth amendment "search." *Id*. at 996-98. Unlike the Eleventh Circuit precedent relied on by the police in *Davis*, however, *Garcia* was not "binding appellate precedent" on Illinois state

courts, the jurisdiction in which the Aurora police were operating and in which defendant was prosecuted.

¶ 115    The applicable body of case law upon which a law enforcement officer may reasonably rely consists of those decisions that are binding on the jurisdiction in which the officer operates. See *Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (noting that officers are expected to learn and abide by "what is required of them" by courts having jurisdiction over them). The *Davis* good-faith exception thus is not available unless there exists binding precedent within the particular jurisdiction governing the law enforcement officials. See *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) (holding that "binding appellate precedent" within the meaning of *Davis* refers only to precedent of the Second Circuit and the United States Supreme Court); *United States v. Barraza-Maldonado*, 732 F.3d 865, 867 (8th Cir. 2013) ("[f]or the good faith exception to apply, officers performing a particular investigatory action—such as GPS tracking—must strictly comply with binding appellate precedent governing the jurisdiction in which they are acting").

¶ 116    Where state courts are silent on the constitutionality of a particular police practice, law enforcement officers who engage in that practice without first obtaining a search warrant from a neutral magistrate must knowingly accept the risk that their conduct will be found unconstitutional. First, they risk that a state court may decide to depart from federal case law in interpreting a federal constitutional provision. Caleb Mason, *New Police Surveillance Technologies and the Good-Faith Exception: Warrantless GPS Tracker Evidence After United States v. Jones*, 13 Nev. L.J. 60, 76 (2012). Decisions of a United States court of appeals, while persuasive, are not binding on state courts. *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 398 (1992) (citing *People v. Fields*, 135 Ill. 2d 18, 72 (1990)); see also *People v. Eyler*, 133 Ill. 2d 173, 225 (1989) ("[u]ntil the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions"). Second, the police risk that a state court may interpret a constitutional provision in its own state constitution more strictly than a corresponding provision in the federal constitution. See *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 390 (1992). In fact, this court has held that the Illinois Constitution of 1970 "offers greater protection against the invasion of an individual's privacy rights than does the Federal Constitution." *Id*. Thus, in a posture of state silence and federal approval of a particular search, the exclusionary rule serves its intended purpose: to "deter future Fourth Amendment violations." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2426; see also *id*. at ___, 131 S. Ct. at 2435 (Sotomayor, J., concurring in the judgment) ("when police decide to conduct a search or seizure in the absence of case law (or other authority) *specifically sanctioning such action*, exclusion of the evidence obtained may deter Fourth Amendment violations" (emphasis added)); Caleb Mason, *New Police Surveillance Technologies and the Good-Faith Exception: Warrantless GPS Tracker Evidence After United States v. Jones*, 13 Nev. L.J. 60, 76 (2012).

¶ 117    Of course, the police can avoid the harsh consequence of the evidence being excluded by obtaining a warrant in the first place, rather than gambling that the search will not eventually be held unconstitutional by a court in that jurisdiction.[8] In this case, the officers were state police

---

[8]A warrant is now statutorily required in Illinois before the police may use a GPS to track a person's movements. Effective August 26, 2014, the Freedom From Location Surveillance Act requires a law enforcement agency to obtain a court order supported by probable cause before using an electronic

officers investigating a state crime and had no reason to believe that the case would be prosecuted in federal court.[9] Accordingly, the officers could not have presumed, in reliance on *Garcia*, that the warrantless installation of the GPS device was constitutional.

¶ 118　　　　For the foregoing reasons, I respectfully dissent.

¶ 119　　　　JUSTICES FREEMAN and THEIS join in this dissent.

---

device to obtain "current or future location information pertaining to a person or his or her effects." Pub. Act 98-1104, § 10 (eff. Aug. 26, 2014).

[9]The majority emphasizes that the Aurora police detective "stood in exactly the same shoes" as the Alabama police officer in *Davis*, who conducted a search in the course of investigating a state traffic offense and was found to have relied on federal appellate precedent. *Supra* ¶¶ 31, 52. At the time of the search in *Davis*, however, Alabama state case law expressly authorized the search. *State v. Gargus*, 855 So. 2d 587, 590 (Ala. Crim. App. 2003); see Caleb Mason, *New Police Surveillance Technologies and the Good-Faith Exception: Warrantless GPS Tracker Evidence After United States v. Jones*, 13 Nev. L.J. 60, 77 n.101 (2012). By contrast, prior to the search in this case, no Illinois state court had addressed the constitutionality of GPS installation or tracking.