# Illinois Official Reports

## Appellate Court

---

### *People v. Dunmire*, 2019 IL App (4th) 190316

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DAVID E. DUNMIRE, Defendant-Appellee. |
| District & No. | Fourth District<br>No. 4-19-0316 |
| Filed | December 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Scott County, No. 18-CF-7; the Hon. David R. Cherry, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael Hill, State's Attorney, of Winchester (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Todd M. Goebel, of Gates, Wise, Schlosser & Goebel, of Springfield, for appellee. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice Cavanagh concurred in the judgment and opinion. |

**OPINION**

¶ 1    In May 2018, the State charged defendant, David E. Dunmire, with two counts of aggravated driving under the influence (625 ILCS 5/11-501(a)(1), (2), 11-501(d)(1)(I) (West 2016)) and two counts of driving under the influence (*id.* § 11-501(a)(1), (2)). In February 2019, defendant filed a motion to suppress evidence, claiming the traffic stop that resulted in his arrest was unlawful at its inception because it was not supported by reasonable suspicion. Specifically, defendant claimed that the police officer who stopped defendant's vehicle did so based on his suspicion that it had illegally tinted windows, but that officer lacked the training or tools to ascertain whether the windows were, in fact, illegally tinted.

¶ 2    In May 2019, the trial court conducted a hearing on defendant's motion to suppress, at which the arresting officer was the sole witness. The day after the hearing, the trial court issued a written order granting the motion because the officer "had no way to confirm his suspicions of a window tinting violation."

¶ 3    The State appeals, arguing that the trial court erred by granting defendant's motion to suppress because it applied an incorrect standard applicable to the fourth amendment. We agree, reverse the judgment of the trial court, and remand for further proceedings.

¶ 4                                    I. BACKGROUND
¶ 5                    A. The Charges and Defendant's Motion To Suppress
¶ 6    In May 2018, the State charged defendant with two counts of aggravated driving under the influence (*id.* §§ 11-501(a)(1), (2), 11-501(d)(1)(I)) and two counts of driving under the influence (*id.* § 11-501(a)(1), (2)). In February 2019, defendant filed a "motion to quash arrest and suppress evidence," claiming that the traffic stop was unlawful because the officer did not have a reasonable, articulable suspicion that the windows of defendant's vehicle were illegally tinted, which was the sole justification for the stop.

¶ 7    Defendant asserted that he was stopped on February 7, 2018, for having illegally tinted windows. Defendant alleged that the officer did not observe defendant break any traffic laws. Defendant also alleged that section 12-503 of the Illinois Vehicle Code (Vehicle Code) permits the front-side windows (those adjacent to the driver on either side of the vehicle) to be tinted up to 35% "with a 5% variance observed by any law enforcement official metering the light transmittance." *Id.* § 12-503(a-5), (2).

¶ 8    Defendant argued that an officer needed specialized training to be able to differentiate between legally and illegally tinted windows in order to have reasonable suspicion of a violation. Defendant noted that the case was an issue of first impression in Illinois but cited several out-of-state cases in support of his position.

¶ 9    Defendant further contended that the officer did not have probable cause to arrest him for driving under the influence based on the field sobriety tests administered on the scene. Defendant asked the trial court to "quash[ ]" his arrest and to suppress "[a]ll evidence obtained from the illegal stop, detention, search, and/or custodial interrogation."

¶ 10                                    B. The Hearing
¶ 11    In May 2019, the trial court conducted a hearing on defendant's motion to suppress. Officer Ryan Scott Crowder of the Bluffs Police Department testified that he had been a police officer

since August 2017. On the night of February 7, 2018, he was in his patrol car, which was parked near the Bluffs High School. Crowder was facing south on Highway 100. Defendant introduced into evidence a satellite image, obtained from Google Maps, depicting where Crowder was located prior to the stop. The map shows that the high school is on the northern edge of Bluffs with a large wooded area directly to the east, farmland to the northwest, and a residential area to the south and west, across the street from the school. On the map, Crowder is marked as being parked adjacent to the roadway on the west side of the southbound lane of Highway 100. Crowder is also adjacent to a fairly large school building, which would have been on the right side of his squad car.

¶ 12　　At some point, Crowder became aware from his side mirror that a car was approaching with its headlights on. Crowder stated he first noticed the vehicle when it "was a little bit behind me but more so directly parallel beside me." Crowder did not turn around or look behind him. As the car was parallel with him, he noticed that the side windows were so dark he could not see into the vehicle. Crowder pulled out and followed the vehicle but did not observe it violate any traffic laws. Crowder initiated a traffic stop because he believed the windows were illegally tinted.

¶ 13　　Crowder testified that he believed the law in Illinois was that a vehicle could have "30 percent tint all the way around." When asked to explain what 30% tint meant, Crowder stated, "I know that if you have 30 percent tint the lower the number the darker the tint, like 5 percent, zero percent is almost like limo tint. You can't see it at all." Crowder testified that at 30% tint, "[he] would probably say 70 percent" of light could pass through the window. Defense counsel then read the language of the window tint statute (see *infra* ¶ 61), and the following exchange occurred:

> "Q. The Statute says that only 30 percent of the light has to pass through. So, you were mistaken about the law?
> A. I know that I could not see into the window. I could not see anyone in the vehicle.
> Q. And you thought that was the standard?
> A. Correct.
>
>         * * *
>
> Q. *** Were you familiar with that [35%] portion of the Statute?
> A. When I made the stop, I was under the impression that the window appeared illegal.
> Q. Based on what percentage were you dealing with?
> A. It was the fact that I could not see into the vehicle, which told me that evidently those tint, excuse me, those windows must be illegal.
> Q. Well window tinting is permitted in Illinois, correct?
> A. Correct.
>
>         * * *
>
> Q. Your understanding was that 70 percent of the light had to pass through, correct?
> A. Correct.
> Q. And that's a lot of light that's passing through, correct, more than half, correct?
> A. Correct.

Q. And the Statute actually says that only 30 percent of the light has to pass through, which is less than half, correct?

A. Correct.

Q. And you were under a mistaken believe [*sic*] about the law, correct?

A. It appeared to be illegal at the time of the stop.

Q. You were under a mistaken belief about the law, correct?

A. No."

¶ 14 Crowder testified he did one training exercise at the police academy concerning tinted windows. Crowder said instructors showed the trainees six different vehicles with varying levels of tint—some legal, some illegal. Crowder acknowledged he could not remember (1) the number of legal versus illegal windows, (2) the percentage of tint on any window, or (3) if any were at or near 35%. Crowder assumed some of the cars were near the 35% limit because there were so many variations. Crowder also could not recall if any of them were "limo dark, *** allowing no more than 5 percent."

¶ 15 Crowder explained that the training occurred in the afternoon and the vehicles were stationary. Crowder could not remember how far away from the vehicles during his training he was or if there were any light sources present other than the sun. Crowder acknowledged he had no training on identifying illegally tinted windows at night or on moving vehicles. He did not receive any training "on whether or not you should be able to see a person inside of a vehicle at night on legal versus illegal tinting."

¶ 16 Crowder agreed that when he was in his squad car, his "view of the windows next to [him was] not [illuminated] with the spotlights [or] overhead lights." He further agreed it was "pitch black" the night he stopped defendant, and the only lighting in the area was a "street light [*sic*] pole near the school," which was "probably less" than 100 feet away. Crowder stated the light was just an "area light" and was not directed at defendant's vehicle. The following exchange occurred:

"Q. You didn't receive any training at the academy on detecting tinting violations at night?

A. No, class was not held at night. No.

Q. You did not receive any training at the academy on whether or not you should be able to see a person inside of a vehicle at night on legal versus illegal tinting?

A. No.

Q. So, that's just something you have come up on your own?

A. I know that on normally, legally tinted windows you can usually see the outline of a person or you can see inside the vehicle. When you cannot see inside the vehicle, it's an officer safety issue.

Q. Okay. So, how many of these normally tinted windows have you mentioned you have actually tested?

A. I do not recall.

* * *

Q. Okay. So, at the time of the traffic stop you had never tested any vehicles to see if you are—

A. At the academy they had a tint meter.

- 4 -

> Q. From the time of the academy when you were dealing with 6 vehicles until the time of the traffic stop, had you ever used a tint, a device to measure the tinting of any vehicles?
>
> A. No one—my department, the department did not have one at the time.
>
> Q. So, you have no way of knowing if you can see through legally tinted windows at night?
>
> A. No."

Crowder acknowledged that he did not issue a citation to defendant for the tinted windows and he never tested the windows.

¶ 17      On cross-examination, Crowder stated that if 70% of light could pass through a window, a person "could see into the vehicle very easily." Crowder reiterated that he could not see inside defendant's vehicle and stated it did not appear that 70% of the light was passing through it. Crowder stated he had been trained "[v]ery briefly" on "actually what the statute specifically means." Crowder further stated that a tint meter simply gives a number and a person did not need to know what those numbers meant.

¶ 18      Defendant did not present any other evidence, nor did the State. The trial court took the matter under advisement.

¶ 19                    C. The Trial Court's Ruling

¶ 20      The day after the hearing, the trial court issued a written order granting defendant's motion. The court began by observing as follows:

> "The testimony of Officer Crowder confirms that the only violation that he observed as this vehicle passed his stationary location was his belief that the said vehicle has illegally tinted side windows. His belief was based upon his inability to see inside the vehicle through the side windows as the car passed him from the rear."

¶ 21      According to the court, the first question it had to address was whether Crowder had "a right to be where he was when he observed what he believed to be a violation." The court noted that Crowder "testified that as the vehicle passed his parked squad car, he observed what he believed to be illegally tinted side windows on that vehicle. Obviously, up to that point, Officer Crowder had [a] right to be where he was when he observed what he believed to be a violation."

¶ 22      However, the trial court found significant the fact that Crowder admitted neither he nor his department had a tint meter, which was required to determine if a violation had occurred. The court stated, "So, the officer knew before he stopped the Defendant, that he needed a Tint Meter to proper[l]y investigate a suspected window tint violation, which the officer did NOT have in his possession or at his disposal since his department did not even possess such a device." (Emphasis in original.) The court reasoned that "[s]ince he did not have the requisite technical assistance of the equipment needed to confirm his suspicions, what was he going to do after he stopped the vehicle? Did the officer still have a right to make the stop?" The trial court concluded that Crowder "had no right to stop the Defendant's vehicle since he had no way to confirm his suspicions of a window tinting violation. He had no right to be where he was when he observed the Defendant's alleged driving under the influence of alcohol."

¶ 23      The trial court concluded that the out-of-state cases cited by defendant were inapposite because they dealt with differently worded statutes. Therefore, the court did not consider them.

The court granted the motion and suppressed "all evidence obtained as a result" of defendant's arrest.

¶ 24    This appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26    The State appeals, arguing that the trial court erred by granting defendant's motion to suppress because it applied an incorrect standard applicable to the fourth amendment. We agree, reverse the judgment of the trial court, and remand for further proceedings.

¶ 27                        A. Motions to "Quash Arrest"

¶ 28    As an initial matter, the State points out—and defendant acknowledges—that defendant filed an incorrect motion in the trial court, titled "motion to quash arrest and suppress evidence." As this court has repeatedly stated, " '[m]otion to quash arrest' is an arcane phrase that has a ring of authenticity but is actually meaningless verbiage." *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 30, 66 N.E.3d 601. "This title is improper because defendant is not challenging his arrest as void but challenging whether the arresting officer had probable cause or reasonable suspicion. A proper title for such a motion is 'motion to suppress evidence.' " *Id.* ¶ 22. A " 'motion to quash arrest' (1) is unnecessary to achieve a defendant's goal of suppressing evidence, (2) adds nothing to an analysis of whether a motion to suppress based upon an allegedly illegal search or stopping should be granted, and (3) only adds confusion to such an analysis." *Id.* ¶ 23 (citing *People v. Hansen*, 2012 IL App (4th) 110603, ¶ 63, 968 N.E.2d 164).

¶ 29    Our concern is not merely academic. As we have explained,

> " 'A motion to suppress is, in effect, a pleading to the extent that it frames the issues to be determined in a pretrial hearing on the motion. The fundamental role of a pleading is to give an opposing party notice of the pleader's position concerning the facts and law so that the opposing party can begin to prepare his defense. A pleading thus both defines and limits the areas of consideration at a trial or other evidentiary hearing ***, by enabling the court to determine the relevance of offered evidence.' " *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 60, 996 N.E.2d 1227 (quoting *State v. Johnson*, 519 P.2d 1053, 1057 (Or. Ct. App. 1974)).

¶ 30    "Suppressing the evidence obtained by the police as a result of an improper stop is the entirety of the relief to which a defendant is entitled. That is also the only relief provided for in section 114-12 of the Code of Criminal Procedure of 1963 (Procedural Code) (725 ILCS 5/114-12 (West 2010)), which is entitled, 'Motion to Suppress Evidence Illegally Seized.' " *Hansen*, 2012 IL App (4th) 110603, ¶ 63.

¶ 31    "Noting the lack of success in our effort to make this message clear, we recently called upon trial courts to *sua sponte* reject such motions and 'give the counsel who filed the inappropriate motion the opportunity to file a proper motion to suppress under section 114-12 ***.' " *People v. Evans*, 2017 IL App (4th) 140672, ¶ 13, 73 N.E.3d 139 (quoting *Winchester*, 2016 IL App (4th) 140781, ¶ 30). Unfortunately, we must do so again. "We disapprove of filing meaningless motions to 'quash arrest' when the goal is to suppress evidence, and we again call upon trial courts to *sua sponte* reject such motions on their face." *Id.*

- 6 -

¶ 32    In his brief, defense counsel stated that, after reviewing *Winchester* and this court's other precedent, "the State's criticism for styling the Motion to Suppress as a 'Motion to Quash Arrest' is well-taken. It will not happen again." We appreciate counsel's candor and commitment to correct this mistake. Aside from the title and the failure to cite section 114-12, defendant's motion largely complies with the requirements if one considers defendant's request to suppress "[a]ll evidence obtained from the illegal stop, detention, search, and/or custodial interrogation" to be a sufficient identification of the evidence to be suppressed.

¶ 33                          B. The Standard of Review

¶ 34    As stated earlier, the proper method for a defendant to request the suppression of evidence is to file a motion pursuant to section 114-12 of the Procedural Code. 725 ILCS 5/114-12 (West 2018). The defendant bears the burden of proof at a hearing on a motion to suppress. *People v. Cregan*, 2014 IL 113600, ¶ 23, 10 N.E.3d 1196. If the defendant makes a *prima facie* showing that the evidence was obtained through an illegal search or seizure, the burden then shifts to the State, which must present evidence to counter that *prima facie* showing. *Id.* However, "[t]he ultimate burden of proof remains with the defendant." *Id.*

¶ 35    "When reviewing a ruling on a motion to suppress, a bifurcated standard of review applies." *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 49. "[T]he trial court's findings of fact are entitled to great deference, and we will reverse those findings only if they are against the manifest weight of the evidence." *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8, 98 N.E.3d 420. "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39, 106 N.E.3d 944. A trial court's conclusions of law are reviewed *de novo*. *Heritsch*, 2017 IL App (2d) 151157, ¶ 8.

¶ 36                  C. The Trial Court Applied an Incorrect Standard

¶ 37    The State argues the trial court erred by granting defendant's motion to suppress because it applied an incorrect standard. The State contends the court ruled that the stop was impermissible because Crowder did not have a tint meter to confirm or dispel his suspicion at the time he made the stop. The State asserts that this "confirmable suspicion standard" is contrary to Illinois law. We agree.

¶ 38                               1. Terry *Stops*

¶ 39    The United States Constitution and the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "[T]he touchstone of the fourth amendment is reasonableness, which is measured objectively by examining the totality of the circumstances surrounding a police officer's encounter with a citizen." *People v. Lake*, 2015 IL App (4th) 130072, ¶ 28, 28 N.E.3d 1036.

¶ 40    In *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 28, this court recently summarized the law of *Terry* stops as follows:

> " 'In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court provided an exception to the warrant and probable cause requirements.' *People v. Walker*, 2013 IL App (4th) 120118, ¶ 33, 995 N.E.2d 351. 'Pursuant to *Terry*, a police officer may conduct a brief,

investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime.' *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092. A *Terry* stop 'must be justified at its inception, and the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 40, 996 N.E.2d 575. *** 'The officer's conduct is judged by an objective standard, which analyzes whether the facts available to the officer *at the moment of the stop* justify the action taken.' *People v. Hill*, 2019 IL App (4th) 180041, ¶ 17, 123 N.E.3d 1236." (Emphasis added.)

¶ 41 A reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and "obviously less" than that necessary for probable cause. *Navarette v. California*, 572 U.S. 393, 397 (2014). As such, police officers "may make a lawful *Terry* stop without first determining whether the circumstances [they] observed would satisfy each element of a particular offense." *People v. Little*, 2016 IL App (3d) 130683, ¶ 18, 50 N.E.3d 655. Even the higher standard of probable cause "concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *People v. Grant*, 2013 IL 112734, ¶ 11, 983 N.E.2d 1009. "Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false." *People v. Wear*, 229 Ill. 2d 545, 564, 893 N.E.2d 631, 643 (2008).

¶ 42 "In making its decision on [a] motion [to suppress], the trial court's focus is not on 'whether an offense was actually committed but whether an arresting officer reasonably suspected at the time of the stop that criminal activity was taking place or about to take place.' " *People v. Price*, 2011 IL App (4th) 110272, ¶ 28, 962 N.E.2d 1035 (quoting *People v. Cole*, 369 Ill. App. 3d 960, 969-70, 874 N.E.2d 81, 89-90 (2007)).

¶ 43                                                 2. *This Case*

¶ 44 In its ruling, the trial court questioned why Crowder would stop defendant when he did not have any means of determining if a window tint violation had occurred. The court concluded that Crowder had no right to make the stop because he had no ability to confirm or deny his suspicions. Although the purpose of a *Terry* stop is to quickly confirm or dispel an officer's suspicions (*People v. Close*, 238 Ill. 2d 497, 512, 939 N.E.2d 463, 471 (2010)), an officer does not need a method to conclusively establish a violation before deciding to initiate a stop. This remains true even if the officer could never receive any more *technical* information to confirm or dispel his suspicions. What happens after a stop has been made is irrelevant to the question of whether it was justified *at its inception*.

¶ 45 Here, the court clearly applied an incorrect standard. "The basis for the stop must exist prior to the stop and cannot arise after the fact or be judged in hindsight." *People v. Estrada*, 394 Ill. App. 3d 611, 619, 914 N.E.2d 679, 687 (2009). Accordingly, the trial court should not have considered what the officer would need to do after the stop was made to prove the offense for which the officer made the stop. Instead, the trial court should have considered the totality of the facts known to the officer at the time he initiated the stop to determine whether those facts and the reasonable inferences that could be drawn from them would lead a reasonably cautious person to suspect that criminal activity may be afoot. *People v. Colyar*, 2013 IL 111835, ¶ 40, 996 N.E.2d 575.

¶ 46    If the trial court's analysis were correct, it would mean that an officer could never make a traffic stop for speeding if the officer had not used a radar gun or a similar device to determine the speed of the stopped vehicle. Using the facts of this case to explain this point, imagine if Crowder had observed defendant's vehicle driving through the town of Bluffs (with a 30-mile-per-hour speed limit) at—what Crowder reasonably believed—to be an extraordinarily high speed, perhaps as much as 80 miles per hour. According to the trial court's reasoning, if Crowder were to stop defendant's vehicle after seeing it speed through town, Crowder's stop would be unlawful because, once the vehicle was stopped, Crowder would have no basis to determine how fast it was going when he observed it. Obviously, such a rule would make no sense.

¶ 47                          3. *Defendant's "Pretext" Argument*

¶ 48    Defendant claims that the trial court's comments regarding Crowder's inability to confirm the offense for which he made the traffic stop amounted to a "backhanded" credibility determination. Essentially, defendant says, the court was observing that Crowder knew he had no way to investigate the window tint violation, and therefore the stop must have been pretextual. According to defendant, courts carefully scrutinize police conduct after a pretextual stop.

¶ 49    However, as we just stated, the focus of the inquiry is whether the stop was justified at its inception. Further, even assuming defendant's characterization were accurate, pretextual stops are permissible so long as a reasonable suspicion of a traffic violation exists. See *Whren v. United States*, 517 U.S. 806, 813 (1996). Accordingly, the focus of the inquiry remains on the objective circumstances that may give rise to reasonable, articulable suspicion.

¶ 50              D. Whether the Stop Was Justified at Its Inception

¶ 51    Although the trial court applied an incorrect standard, this court reviews judgments, not the reasons therefor, and may affirm a decision on any basis clearly demonstrated by the record. *People v. Johnson*, 208 Ill. 2d 118, 129, 803 N.E.2d 442, 449 (2003). Thus, as previously stated, the question this case presents is whether Crowder had a reasonable and articulable suspicion that the window tint on defendant's vehicle violated the Vehicle Code.

¶ 52    The State argues that Crowder's testimony that he could not see into the vehicle or see anyone inside the vehicle was sufficient to create a reasonable and articulable suspicion of a window tint violation. The State points out that this court has held that the purpose of the statute is to protect officers by enabling them to see inside vehicles (*People v. Hagen*, 191 Ill. App. 3d 265, 267, 547 N.E.2d 577, 579 (1989)), and Crowder testified that when windows are too dark and officers cannot see inside a vehicle, a safety issue is created.

¶ 53    The State further argues that Crowder sufficiently understood the statute because he correctly stated that the lower the percentage, the more tint. In addition, the State asserts that the fact Crowder misstated how much light could pass through the window at 30% tint is irrelevant.

¶ 54    Defendant argues that Crowder's testimony demonstrated that he did not understand the law. Defendant also notes that the statute is not ambiguous at all, and therefore Crowder's misunderstanding could not be reasonable. Defendant further contends that Crowder's suspicion was unreasonable because he lacked adequate training to know what an illegally

tinted window looked like at night. We disagree with defendant's arguments and agree with the State.

¶ 55 We begin by addressing defendant's arguments concerning whether Crowder made a mistake of law. We then consider whether the factual circumstances were sufficient to give rise to a reasonable, articulable suspicion of a window tint violation.

¶ 56                                1. *Mistakes of Law*
¶ 57                                a. The Applicable Law
¶ 58 Reasonableness is the "ultimate touchstone of the Fourth Amendment"; perfection is not required. (Internal quotation marks omitted.) *Heien v. North Carolina*, 574 U.S. ___, ___, 135 S. Ct. 530, 536 (2014). "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground" without violating the fourth amendment. *Id.* at ___, 135 S. Ct. at 536. "[T]he standard for determining whether a reasonable mistake of law has been made is an objective one, and *** courts 'do not examine the subjective understanding of the particular officer involved.' " *People v. Gaytan*, 2015 IL 116223, ¶ 46, 32 N.E.3d 641 (quoting *Heien*, 574 U.S. at ___, 135 S. Ct. at 539). "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable." (Emphases in original.) *Heien*, 574 U.S. at ___, 135 S. Ct. at 539. "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Id.* at ___, 135 S. Ct. at 539-40.

¶ 59 In *Gaytan*, the Illinois Supreme Court first examined the text of the statute at issue and then applied traditional canons of construction to determine if the statute was ambiguous. *Gaytan*, 2015 IL 116223, ¶¶ 23-48. If the statute is ambiguous, by its very nature it "is capable of being understood by reasonably well-informed persons in two or more different ways." *Id.* ¶ 48. However, if the plain language of a statute is clear or prior courts have clearly interpreted a statute, failure to follow the clear interpretation is not objectively reasonable. See *People v. Walker*, 2018 IL App (4th) 170877, ¶ 26, 115 N.E.3d 1012 (citing *People v. LeFlore*, 2015 IL 116799, ¶ 69, 32 N.E.3d 1043).

¶ 60                                b. The Window Tint Statute
¶ 61 Section 12-503 of the Vehicle Code sets forth the requirements for visibility through windows on cars in Illinois. 625 ILCS 5/12-503 (West 2016). Subsection (a-5) deals with window tint and states, in relevant part, as follows:

> "No window treatment or tinting shall be applied to the windows immediately adjacent to each side of the driver, except:
>
> ***
>
> (2) On vehicles where none of the windows to the rear of the driver's seat are treated in a manner that allows less than 35% light transmittance, a nonreflective tinted film that allows at least 35% light transmittance, with a 5% variance observed by any law enforcement official metering the light transmittance, may be used on the vehicle windows immediately adjacent to each side of the driver." *Id.* § 12-503(a-5).

¶ 62 Prior to 2010, Illinois law did not permit any tint on the front driver's or passenger's side windows. 625 ILCS 5/12-503(a) (West 2008); Pub. Act 96-815 (eff. Oct. 30, 2009) (adding

625 ILCS 5/12-503(a-5)). As this court has previously recognized, "[t]he purpose of the prohibition against tinted windows is to protect the safety of law enforcement personnel who stop and approach a vehicle. Tinted windows prevent law officers from perceiving any dangers or problems inside the vehicle." *Hagen*, 191 Ill. App. 3d at 267. "As long as the officer has reasonable grounds to believe a [window tint] violation is occurring, *** a stop is constitutionally permissible." *People v. Strawn*, 210 Ill. App. 3d 783, 787, 569 N.E.2d 269, 273 (1991).

¶ 63                                            c. This Case

¶ 64    The window tint statute at issue in this case is hardly ambiguous. Indeed, the statute explicitly provides the permissible level of tinting in exact percentages based upon the relative tint of the rear windows and permits "a 5% variance observed by any law enforcement official metering the light transmittance." 625 ILCS 5/12-503(a-5)(2) (West 2016). The statute clearly contemplates violations will be determined through the use of a tint meter; no interpretation is required. However, that does not end the inquiry.

¶ 65    Defendant claims Crowder clearly misunderstood the wording of an unambiguous statute and therefore made an unreasonable mistake of law. The State contends Crowder, in fact, understood the statute because he stated that 30% was the lower limit and the lower the percentage the darker the window. The State further contends that even if Crowder had a mistaken belief about the law, the facts and circumstances surrounding the stop objectively give rise to a reasonable and articulable suspicion that a violation of the statute occurred. The State is correct.

¶ 66    First, the record is unclear as to whether Crowder, in fact, misunderstood the law. Crowder testified that 30% was the limit, which is consistent with the statute because a 5% variance is permitted. Crowder also stated that the lower the percentage, the less light passes through the window. Transmittance is defined as "the fraction of radiant energy that having entered a layer of absorbing matter reaches its farther boundary." Merriam-Webster's Collegiate Dictionary, 1251 (10th ed. 2000). To the extent Crowder misunderstood the law, his misunderstanding does not *per se* render the stop unreasonable.

¶ 67    The State offers a useful hypothetical. An officer who observes a defendant with a pound of marijuana would be justified in arresting that defendant, even if the officer mistakenly believed the amount of marijuana one could have for personal use was 20 grams instead of 30 grams, as delineated by statute. See Pub. Act 101-27, § 10-10 (eff. June 25, 2019). In this hypothetical, the officer observed an amount of marijuana that was obviously above the required threshold. See *Cole*, 369 Ill. App. 3d at 968 ("It only follows that if, despite the officer's mistaken interpretation of the law, the facts known to him raised a reasonable suspicion that the defendant was in fact violating the law as written, the traffic stop was constitutional.").

¶ 68    In the present case, Crowder testified that he could not see inside the vehicle at all. Crowder's complete inability to see through the windows could give rise to a reasonable, articulable suspicion—under both his mistaken standard and the correct one—that defendant's tinted windows violated the Vehicle Code. Moreover, because this court has stated that the purpose of the prohibition on window tint is to promote officer safety by allowing the police to see inside a vehicle, the test Crowder understood by his training to apply, and did apply, was presumptively reasonable.

¶ 69                    2. *Whether Crowder's Suspicion Was Objectively Reasonable*
                               *Under the Circumstances*

¶ 70        Nonetheless, our inquiry is not finished. The question now becomes whether Crowder's
       suspicion was reasonable under the circumstances.

¶ 71                           a. Reasonable Suspicion Defined

¶ 72        Temporary stops of vehicles are reviewed under the familiar framework of *Terry. People
       v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092. A police officer may stop a vehicle if he
       has a reasonable suspicion that the vehicle has committed a traffic violation. See *id.* "To justify
       a *Terry* stop, officers must be able to point to specific and articulable facts that, considered
       with the rational inferences therefrom, make the intrusion reasonable." *People v. McMichaels*,
       2019 IL App (1st) 163053, ¶ 22.

¶ 73        "Although 'reasonable, articulable suspicion' is a less demanding standard than probable
       cause, an officer's suspicion must amount to more than an 'inchoate and unparticularized
       suspicion or "hunch" ' of criminal activity." *Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry v.
       Ohio*, 392 U.S. 1, 27 (1968)). Police are allowed "to draw on their own experience and
       specialized training to make inferences from and deductions about the cumulative information
       available to them that might well elude an untrained person." (Internal quotation marks
       omitted.) *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "The test is not what the officer
       should have seen, but whether, viewed objectively, the totality of the facts and circumstances
       known to the officer at the time of the stop would warrant a reasonable and prudent person to
       believe a crime had been committed." (Internal quotation marks omitted.) *People v. Adams*,
       225 Ill. App. 3d 815, 818, 587 N.E.2d 592, 595 (1992).

¶ 74                        b. The Proper Standard in Window Tint Cases

¶ 75        The State argues that Crowder testified that he could not see anything inside the vehicle,
       and therefore, he clearly stated a reasonable suspicion of a violation. After all, the complete
       inability to see through a window would be the height of a violation. But this is not so under
       all circumstances. Certainly, on a sunny day or under a large amount of direct lighting, one
       would expect to be able to see into a vehicle. However, it is also obvious that in complete
       darkness, one could not see through even the clearest glass. Light is a necessary condition for
       seeing.

¶ 76        For his part, defendant urges this court to follow other states that have held that an officer's
       ability to discern between legally and illegally tinted windows, based on the percentages
       permitted by statute, is necessary to justify reasonable suspicion. See, *e.g.*, *State v. Williams*,
       934 A.2d 38, 47-48 (Md. 2007) ("[i]f an officer chooses to stop a car for a tinting violation
       based solely on the officer's visual observation of the window, that observation has to be in
       the context of what a properly tinted window, compliant with the 35% requirement, would
       look like. If the officer can credibly articulate that difference, a court could find reasonable
       articulable suspicion, but not otherwise."); *State v. Conaway*, 2010 WI App 7, ¶ 7, 323 Wis.
       2d 250, 779 N.W.2d 182 (substantially similar). In other words, those courts assert that an
       officer should be able to testify as to the visual differences between a window that is legally
       tinted at or near 35% versus a window that is illegally tinted below 35%. We reject such a rigid
       standard.

¶ 77     The fourth amendment requires a totality of the circumstances approach, and the facts of each individual case must be considered. We view the Illinois Supreme Court's decision in *People v. Gocmen*, 2018 IL 122388, ¶ 32, 115 N.E.3d 153, as particularly helpful, even though that case dealt with probable cause rather than reasonable suspicion.

¶ 78     In *Gocmen*, the defendant was arrested for driving under the influence, and the officer eventually reached the conclusion that the defendant was under the influence of illegal drugs. *Id.* ¶¶ 1, 13. The supreme court wrote that "[t]he probable cause question is whether the relatively inexperienced officer could have reasonably concluded that the defendant's obvious impairment was due to his use of drugs." *Id.* ¶ 37. The court explained as follows:

> "Had the officer conducted field sobriety tests, his experience and expertise in conducting such tests and interpreting the results would be at issue. However, no such tests were conducted, and the results of such tests were not the basis for the arrest. The officer's conclusion that defendant was under the influence of drugs was not based on scientific, technical, or specialized knowledge that required specialized training or experience." *Id.*

¶ 79     The Illinois Supreme Court explained that "what constitutes probable cause for searches and seizures must be determined from the standpoint of the arresting officer, with his skill and knowledge, rather than from the standpoint of the average citizen under similar circumstances." (Internal quotation marks omitted.) *Id.* ¶ 32. An officer's experience and training goes to the officer's credibility as a witness and whether the officer's conclusions are reliable. *Id.*

¶ 80     As noted, prior to 2010, window tinting of any kind was not permitted on the front side windows in Illinois. 625 ILCS 5/12-503(a) (West 2008). Under that statute, the ability to see into a vehicle was an easy standard to apply and undoubtedly legally sound because the purpose of the statute was to enable officers to see into stopped vehicles as they approached to observe occupants. However, the statute now permits up to 35% on all windows (excluding the windshield) with a 5% variance. Pub. Act 96-1056 (eff. July 14, 2010).

¶ 81     Given that a substantial amount of tinting is now legal, police must have some ability to discern between legally and illegally tinted windows, and that method must be reliable. After all, *Terry* is concerned with reasonable suspicion of *unlawful* conduct. *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 82     We believe another portion of the statute that addresses window tint provides a useful comparison. Subsection (c) provides that a vehicle may not have any item in the windshield or driver's side window that "materially obstructs the driver's view." 625 ILCS 5/12-503(c) (West 2016). Illinois courts have wrestled with the question of when an officer has reasonable suspicion that something hanging from the rearview mirror is materially obstructing the driver's view. The result has been a fact-specific inquiry.

¶ 83     In *People v. Mott*, 389 Ill. App. 3d 539, 906 N.E.2d 159 (2009), this court concluded that an officer failed to articulate any specific facts giving rise to an inference that the defendant's view was obstructed by an air freshener hanging from the rearview mirror, even though he claimed the air freshener could generally block hazards from view. *Id.* at 544-45. We noted that the trial court made specific factual findings regarding the officer's opportunity to view the air freshener, which he saw when the defendant's car was behind his squad car and to the left. *Id.* at 545. "Most important," we wrote, "[the officer] never testified how he believed the

air freshener might have materially obstructed defendant's view of the road when he decided to stop defendant's car." *Id.* We held as follows:

> "Illinois law does not criminalize [*per se*] the suspension of an object from a rearview mirror. *** [Section] 12-503(c) prohibits the suspension or placement of an object in a window '[which] materially obstructs the driver's view.' See 625 ILCS 5/12-503(c) (West 2006). Size alone does not determine whether an object materially obstructs the driver's view." (Internal quotation marks omitted.) *Id.* at 546.

We concluded that a wide variety of items commonly found hanging from rearview mirrors "could be material obstructions in the proper situation." *Id.*

¶ 84    In *People v. Johnson*, 384 Ill. App. 3d 409, 413-14, 893 N.E.2d 275, 279-80 (2008), this court concluded that an officer's viewing an air freshener (made to resemble cherries) from a distance of two car lengths was insufficient when the officer later reviewed pictures of the air freshener and admitted that it did not materially obstruct the driver's view. We stated, "The photographs show the officer's belief, after a fleeting view in the dark, that the cherries were a material obstruction was not justifiable." *Id.*

¶ 85    By contrast, in *People v. Jackson*, 335 Ill. App. 3d 313, 314, 780 N.E.2d 826, 827 (2002), the Second District concluded that the officer had reasonable suspicion of a violation when he observed " 'what appeared to be a large obstruction' " in the front windshield created by two " 'tree *** shaped' " air fresheners. The officer was travelling in the other direction when he saw the air freshener, and he testified that he observed the vehicle for "approximately two seconds." *Id.*

¶ 86    In short, we held that the opportunity to view the alleged obstruction and the officer's ability to articulate why that object was a *material* obstruction were crucial to the issue of reasonable suspicion. The same is true with regard to window tint. An officer need not be able to describe what windows with particular percentages look like, as long as the officer can articulate (1) the general differences between legally and illegally tinted windows and (2) the facts that made the particular window appear illegally tinted under particular circumstances in which it was viewed.

¶ 87                        c. Crowder Had Reasonable, Articulable Suspicion

¶ 88    Under the facts of this case, even if Crowder were operating under a mistake of law when he stopped defendant, the record does not demonstrate that his suspicion was unreasonable that defendant's tinted windows violated the Vehicle Code. Crowder testified he could not see anything through defendant's windows. Although it is unclear if he should have expected not to see anything, the burden was on defendant to make such a showing. The trial court's order gives no hint that Crowder's testimony was suspect or that he was not acting in good faith.

¶ 89    Crowder's standard—the complete inability to see into a vehicle or to see anyone inside the vehicle—is presumably reliable based upon his understanding of his training. Legally tinted windows, based upon Crowder's training and experience, would allow him to see inside a vehicle or at least see the outline of an occupant therein.

¶ 90    Crowder testified that if he cannot see in, the windows are probably substantially below the 30% limit because they look like limos, which have 0-5% tint. If he can see in, then the windows are clearly legal. Accordingly, we conclude that Crowder articulated a reasonable standard whereby he pulls people over only when their windows appear to be far below the

legal limit. Crowder stated that he could not see anyone or anything through defendant's windows. Therefore, his testimony provided a reasonable, articulable suspicion of a violation of the Vehicle Code.

¶ 91                                      III. CONCLUSION

¶ 92        For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 93        Reversed and remanded.